Leon D. Lazer, J.
The plaintiff in this action, a shareholder and former employee of the defendant Radiological Health Services, P. C. (RHS), seeks dissolution of the corporation, an injunction against enforcement of the covenant not to compete contained in his employment contract and rescission of an agreement which severed a portion of the corporate medical practice and left it in the hands of former shareholder-employees against whom the restrictive covenant has not been enforced. The corporate defendant has counterclaimed for *448 enforcement of the restrictive covenant against the plaintiff and for an accounting. Damages are sought by both plaintiff and the corporation.
THE FACTS
Plaintiff is one of 12 doctors who in 1970 formed RHS as a professional corporation to supplant their then existing partnership in the practice of radiology. Until mid-summer of 1974, the area covered by this practice included most of Suffolk County as well as the eastern portion of Nassau. The shareholders were divided into three "regions” or groups which separately serviced the eastern, central and western portions of the practice and, until plaintiff’s resignation, all of them were under contract as employees of RHS. All of the contracts contained a covenant restricting a withdrawing or terminated employee from. competition for a period of two years.
When plaintiff joined the partnership in 1960 he brought to it the radiological practice he had previously established as an independent practitioner in eastern Suffolk County and thereafter he continued his service as director of radiology at the Southampton Hospital and his association with the Hampton Medical Center and the East Hampton Medical Group. As the practice grew in both forks of the eastern area, the partnership and its corporate successor assigned additional radiologists to serve in that region. A personality conflict which arose between the plaintiff and another partner in the area resulted in the transfer of the defendant Dr. Fiore, in 1968, from the central to the eastern group at plaintiff’s request. Dr. Fiore moved his family to Southampton and, until 1973, plaintiff and he practiced together in relative tranquility. In the summer of 1973, the shareholders decided to explore the feasibility of dissolving RHS and it is apparent from the evidence that from that point forward the plaintiff became concerned that he would be compelled to share the practice in the south fork of Suffolk County with Dr. Fiore in any regional entity which might succeed RHS. In July of 1973, plaintiff made his first complaint to the corporation concerning his colleague and stated he would not accept Dr. Fiore as a partner in the event of dissolution. Plaintiff’s hostility toward Dr. Fiore is the obvious genesis of this litigation.
Although plaintiff disclaimed any charge of incompetence against Dr. Fiore, he testified that he had received various *449 "complaints” about him and that these had increased in August of 1973. He also accused Dr. Fiore of a refusal to accept criticism from him in his capacity as chief of radiology at Southampton Hospital. This testimony was almost wholly conclusory in nature and although the 11 complainants were ultimately named they were not produced and the nature of their complaints was not revealed. An X-ray technician at the hospital, called by plaintiff, testified concerning some of Dr. Fiore’s practices but she displayed such obvious bias on the witness stand that nothing more was established by her testimony than the existence of a fierce personal conflict between the two doctors. As a result of plaintiff’s recriminations an impending first quarter loss of $39,045 by the west end group, a majority of the shareholders (which did not include plaintiff and Dr. Fiore) approved a resolution to dissolve and to terminate operations as of June 30, 1974. Nevertheless, no further corporate action to effectuate dissolution was taken and RHS continued in existence. On July 30 dissolution was deferred to August 16 and at a meeting of shareholders held on August 15, 1974 the dissolution resolution was rescinded and an agreement was approved severing the western group from the corporation and waiving enforcement of the covenant not to compete against the three radiologists who would thus leave RHS.
Although the fact that dissolution was rejected at the same time severance was accepted suggests that the problems in the west were the cause for the interest in dissolution, it is plaintiff’s position that the severance agreement was evolved at "clandestine” meetings and was a part of a conspiracy first to saddle him with Dr. Fiore and then to dissolve. Prior to the vote on the severance issue, plaintiff wrote to the directors of RHS alleging the agreement was illegal but demanding, that he be permitted to resign on the same terms. At the August 15 meeting he cast the only negative vote and resigned as an employee. Attempts to dissuade him were fruitless and on August 19, 1974 the corporate attorney wrote him stating that his employment contract required 90 days’ notice of termination and contained a covenant not to compete and that if any portion of the eastern practice was lost to the corporation legal redress would be sought. Despite the fact that he was still a shareholder and, for another 90 days, a salaried employee of RHS, plaintiff immediately renewed his efforts to secure a separate contract from the Southampton Hospital. *450 Upon receipt of a letter from the RHS attorney advising it of the restrictions contained in plaintiff’s contract of employment, the hospital rejected plaintiff’s proposal.
Plaintiff has continued the south fork practice since his resignation and has received proceeds of corporate operations at the East Hampton Medical Group and the Hampton Medical Center and deposited them in a special account in his name, conceding at the trial that some of the funds deposited were for services rendered by Dr. Fiore. Plaintiff has apparently also made disbursements from his special account, allegedly for business purposes, but he testified that he has not cashed the salary checks remitted to him by RHS during the termination period. Payments by the Southampton Hospital have been deposited by the hospital in an escrow account. The parties seek a judicial determination with respect to all of the funds accumulated.
THE DISSOLUTION ISSUE
Plaintiff’s first cause of action demands judgment dissolving the corporation on the ground that it is paralyzed by dissension and is being held together solely for the purpose of forcing an unwanted associate upon him.
There is no explicit statutory authority for judicial dissolution of a corporation at the request of a minority shareholder. Under sections 1102, 1103 and 1104 of the Business Corporation Law dissolution may be decreed only on petition of a majority of the board or of the shareholders or, in the case of a deadlock, on petition of the holder of 50% of the stock. However, relief is available on the petition of a minority shareholder as a matter of judicial sponsorship where it is alleged that the directors and others in control are looting assets thereby enriching themselves at the expense of minority shareholders or are continuing the corporation’s existence for the sole purpose of benefiting those in control at the expense of the minority (Leibert v Clapp, 13 NY2d 313; see, also, Aliotta v Samperisi, 2 AD2d 901; Gross v Price, 284 App Div 964). A heavier burden is required to sustain such an action for dissolution than is required to sustain a derivative action for waste since the purpose of a dissolution action is not to strengthen the corporation but to end its life, a decision which is properly one for the majority to make (Fontheim v Walker, 282 App Div 373, affd 306 NY 926). Where allegations that the corporation is being continued for the sole benefit of *451 the majority at the expense of the minority have been held sufficient, the activity complained of has generally involved efforts to force the minority to sell their stock at reduced prices, thus freezing them out (see Leibert v Clapp, supra; Leight v 551 Fifth Ave., 18 AD2d 982). It is not sufficient to show merely that the corporation is continued for the purpose of providing a salary and bonus to the majority even where that precludes the possibility of dividends (Kruger v Gerth, 22 AD2d 916, affd 16 NY2d 802; see Matter of Nelkin v H.J.R. Realty Corp., 25 NY2d 543).
In the instant case, plaintiff has not demonstrated that his colleagues have looted or exploited the corporation for the benefit of the majority. The decision to purchase the shares of the west end practitioners and release them from the obligation not to compete was a business judgment within the power of the majority shareholders to make. RHS is a sounder venture as a result of that judgment and plaintiff, as an east end practitioner, is among the least affected by the continuance in practice of any of the resigning radiologists. Plaintiff’s contention that the severance was accomplished secretly and illegally is belied by his own evidence which establishes that tenative plans were presented to the shareholders at a prior shareholders’ meeting and that more than the requisite vote was recorded on August 15. If in fact the decision constitutes the waste or squandering of corporate assets, plaintiff could bring a derivative action (Abrams v Allen, 297 NY 52) but, as he could not succeed in such an action on the current record, neither can he obtain rescission of the severance agreement nor, under the rule in Leibert v Clapp (supra), secure dissolution.
Nevertheless, asserting that the corporation is in essence a partnership, the plaintiff further argues that the dissolution question should be judged by the equitable standards applicable in the case of partnership dissolution (Partnership Law, §63, subd 1, par [f]). Plaintiff’s authority for this thesis, Matter of Pivot Punch & Die Corp. (15 Misc 2d 713, mod 9 AD2d 861), is inapposite because the plaintiff there held 50% of the corporate stock and the shareholders were deadlocked, thus bringing the case within the ambit of section 1104 of the Business Corporation Law. Judge Fuld has written that a less restrictive reading of Leibert v Clapp (supra) is required to permit judicial dissolution of a close corporation upon a showing by the minority that the corporation no longer serves the *452 function for which it was created and employs its assets for the benefit of only some of its shareholders (see his dissent in Nelkin v H J. R. Realty Corp., supra and Kruger v Gerth, supra) but the Court of Appeals has not approved this approach. There is no warrant for dissolution of RHS on the facts adduced in the instant trial.
ENFORCEMENT OF THE RESTRICTIVE COVENANT
In plaintiff’s second cause of action, he seeks the enjoinder of the enforcement of the restrictive covenant in his employment contract. RHS has counterclaimed for such enforcement.
The covenant contained in all the corporation employment contracts (which was also part of the previous partnership agreement) restricts a withdrawing employee from practicing medicine "in any area which is located within a five mile radius of any office, hospital, clinic or other facility which the corporation shall maintain” for a two-year period following withdrawal. The contract also provides that the covenant will be enforced against an employee whose employment has been terminated by the corporation only if the holders of four-fifths of the stock outstanding vote to do so.
Basic to a consideration of the enforceability of a covenant not to compete in an employment contract are five factors: (1) the restriction must be necessary for the employer’s protection; (2) the time must be reasonable; (3) the geographical area must be reasonable; (4) the burden of the employee must not be unreasonable; and (5) the general public must not be harmed (Service Systems Corp. v Harris, 41 AD2d 20). An injunction will not issue unless enforcement is necessary and reasonable for the protection of the employer and the conditions are not unreasonable, unjust or oppressive to the employee (Keen v Schneider, 202 Misc 298, affd 280 App Div 954; Foster v White, 248 App Div 451, affd 273 NY 596). Although there are powerful considerations of public policy which militate against sanctioning the loss of a person’s livelihood, an employer’s interest in retaining its customers is sufficient to support a covenant not to compete where there is a risk that a former employee may be able to divert part of the business (Service Systems Corp. v Harris, supra; Purchasing Assoc. v Weitz, 13 NY2d 267; I. Edward Brown, Inc. v Astor Supply Co., 4 AD2d 177).
The provisions of the instant covenant do not exceed judi *453 daily established standards. The time period of only two years is not unreasonable (Keen v Schneider, supra); with respect to restrictions on the practice of a profession, a covenant which is unlimited as to time will be enforced if the area of restraint is limited and reasonable (Karpinski v Ingrasci, 28 NY2d 45; Foster v White, supra). Restrictions encompassing an entire county (Foster v White, supra) or even a five-county area where the area is coextensive with the employer’s business (Karpinski v Ingrasci, supra) have been held reasonable. Here the restriction which prohibits the practice of medicine within a five-mile radius of an RHS office, hospital, clinic or other facility would now apply only to central and eastern Suffolk County since the corporation no longer has facilities west of Smithtown. Although it is not possible to determine the exact extent of the area required for RHS to protect itself against competition (see Career Placement of White Plains v Vaus, 77 Misc 2d 788) since the practice of radiology is dependent on referrals, the five-mile radius would appear to be reasonable.
Plaintiff offered no direct proof on the issue of the hardship which he would necessarily incur should the covenant be enforced but, after 20 years of practice in eastern Suffolk County, it is obvious that a career elsewhere would involve considerable personal disruption even if limited to two years. Nevertheless, plaintiff is a diplómate in radiology and can practice anywhere in the country. Whether opportunities exist in western Suffolk or in Nassau County does not appear in the record but those areas are legally open to him. On the other hand, plaintiff has established through his own testimony that the south fork practice has been a tremendous asset to RHS and that its loss through his competition would result in serious financial injury to the corporation.
While there is no direct evidence with reference to the effect of enforcement of the covenant on the public (a significant factor in the case of a physician: see 14 Williston, Contracts, § 1639), the competition for radiological contracts in Suffolk County appears to be intense and the implication is that there is adequate coverage.
On this record, therefore, the restrictive covenant is prima facie enforceable, but plaintiff’s argument that enforcement is precluded because of the doctrines of waiver and estoppel and because the corporation wrongfully interfered with his practice and profession requires consideration.
*454 THE ISSUE OF SELECTIVE ENFORCEMENT AS A WAIVER OF defendant’s RIGHT TO ENFORCE THE COVENANT
Prior to plaintiff's resignation, five employee-doctors of RHS (and, before that, two members of the partnership) had withdrawn from the group practice and in no case was the restrictive covenant enforced. The defendants allege that the circumstances of these departures are distinguishable from that of plaintiff. Of the seven departing doctors, one took up practice in Connecticut, another in Manhattan, and a third purchased the corporation’s former Brooklyn practice when RHS found it had difficulty servicing that area. The covenant was also specifically waived for the three west end practitioners as a term of the severance agreement. In the seventh case, the employment of Dr. Goldstein, a nonshareholder, was terminated by the corporation itself after one year. Dr. Goldstein became an assistant to a radiologist whose office is within two miles of an RHS facility and who services St. John’s-Smith-town Hospital, an institution with which various referring physicians of RHS are affiliated. Plaintiff testified that the covenant was not enforced as to Dr. Goldstein because he threatened "to blow the whistle” on one of the other doctors in the corporation. In any event, no RHS shareholder objected to nonenforcement of the covenant on Dr. Goldstein’s termination and the matter of enforcement was never brought to a vote. It is plaintiff’s contention that by virtue of this policy of selective enforcement, RHS has waived its right to enforce the covenant against him and indeed is estopped from asserting it.
It is fundamental that either party to a contract, may waive any of its provisions made for his benefit (10 NY Jur, Contracts, § 344). Thus an employer waives the right to enforce a negative covenant not to compete executed by a former employee where the employer knowingly aids such an employee in his efforts to obtain competing employment (Sentinel Investigation Serv. v Mercury Intelligence Serv., 34 Misc 2d 50). A waiver, unlike estoppel, is dependent solely on what one party intends to do and there is no need to show reliance by the party asserting it (31 CJS, Estoppel, § 61). There would seem to be no inherent reason why the defense of waiver cannot be asserted by a third person who was not a party to the contract the nonenforcement of which gave rise to the defense. Thus the rights of a manufacturer against a distributor under the fair trade law (General Business Law, § 396-a) can be waived where prior price cutting by other distributors has not been *455 enjoined if the prior price cutting was achieved with the connivance or consent of the manufacturer (see National Distillers & Chem. Corp. v R. H. Macy & Co., 23 AD2d 51). However, under fair trade, the waiver is of a right established by statute rather than contract since nonsignatories are equally bound under law by the prices set by the manufacturer (see, e.g., General Elec. Co. v Masters, Inc., 307 NY 229). A situation more analogous to the one at bar exists relative to enforcement of covenants running with the land. In such a case, failure to object to a violation which a landowner considers inoffensive does not result in the forfeiture of his right to prevent violations which he does deem offensive (see Ginsberg v Yeshiva of Far Rockaway, 74 Misc 2d 391, affd 45 AD2d 334).
Integral to the concept of enforcement of covenants not to compete is the balancing of the interest of employer, employee and public welfare in each case (Service Systems Corp. v Harris, supra) and the right to enforce a negative covenant must be determined on an ad hoc basis. Since each case stands on its own particular facts and circumstances (Keen v Schneider, supra), any requirement for uniformity of enforcement would be contrary to the judicially enunciated standard of balancing the interests involved. Even the instant plaintiff testified that he thought the covenant was to be applied solely to protect senior employees from newer men. Since enforcement of negative covenants is permitted solely when stated tests are met, the failure to enjoin all violators is not ipso facto a waiver of the right to enjoin the violators whose competition is offensive.
The essence of waiver is the intentional relinquishment of a known right (American Bridge Co. v State of New York, 245 App Div 535). The intent must be clearly established and cannot be inferred from a doubtful or equivocal act (Cicero Ind. Development Corp. v Roberts, 63 Misc 2d 565) and the burden is on the one claiming the waiver of a right to prove it (92 CJS, Waiver). That burden has not been sustained by this plaintiff. Each case of nonenforcement of the covenant resulted from a business judgment that either there would be no competition or that on balance it would not be offensive. In sum, each case can be justified as being of benefit to the corporation.
As to estoppel, plaintiff has made no showing that he resigned in reliance on the fact that the negative covenant *456 was not previously enforced. He was put on notice by memorandum from the corporate president, dated September 7, 1973, and by the grievance committee at the meeting of September 14, 1973 that as long as dissolution was in abeyance he was under certain contractual obligations to the corporation.
THE CLEAN HANDS DOCTRINE AS A BAR TO ENFORCEMENT
The clean hands doctrine bars equitable relief for the willful misconduct of a plaintiff which is fraudulent, illegal or unconscionable even though not of such a nature as to constitute a crime or a basis of legal action (30 CJS, Equity, p 1018). Hands do not become unclean, however, while exercising lawful authority or power and ill will existing between the parties to a suit does not constitute inequitable conduct (id., p 1021). In the instant case, the corporation had the power — and indeed the obligation — to protect its business interest from plaintiff’s usurpation. The fact that most of its stockholders appear to have sided with Dr. Fiore in what on this record is primarily a personality conflict does not constitute misconduct sufficient to sustain a clean hands defense.
Nevertheless, plaintiff insists that the corporation "wrongfully” interfered with his efforts to make a separate contract with the Southampton Hospital on the rationale that the south fork practice is "his” since he brought it into the group. If this interference could be deemed a breach of the employment contract, the corporation would indeed be barred from enforcing the covenant (Cornell v T. V. Development Corp., 17 NY2d 69; Millet v Slocum, 4 AD2d 528, affd 5 NY2d 734). Here the employment contract explicitly provided that the employee "engage in the practice of medicine only for the Company” and plaintiff has conceded that the corporation could have assigned him to an area other than that of his prior practice. The general rule is that customers belong to the employer (Molina v Barany, 56 NYS2d 124) and that the employer’s interest in retaining its customers is alone sufficient to support a covenant not to compete (Service System Corp. v Harris, supra; see McCall Co. v Wright, 198 NY 143). Where an employee executes the covenant at the same time he accepts employment, the latter becomes consideration for the promise (Ann., 51 ALR3d 825). Lynch v Bailey (275 App Div 527, affd 300 NY 615), cited by plaintiff, in which an employer was held not entitled to enforce such a covenant *457 against an employee who brought his former clientele into the employer’s business is distinguishable since the employment there was brief and the covenant of unreasonable geographic extent. Plaintiffs former clientele as well as that of his fellow employees now "belong” to the corporation and he has established neither a clear right to injunctive relief against enforcement (Reliance Grant Elevator Equip. Corp. v Reliance Ball Bearing Door Hanger Co., 205 App Div 320), nor any defense which will frustrate enforcement.
DR. FIORE’S CROSS-MOTION AND HIS STANDING TO ENFORCE THE COVENANT
In a pretrial motion Dr. Fiore sought, inter alia, a preliminary injunction enjoining plaintiff from "continuing to engage in his illegal and unwarranted campaign to discredit, undermine and impune [sic] the professional reputation of the defendant, Americo S. Fiore, M. D.” Although the motion was denied by Mr. Justice Scileppi he referred its issues to the trial court and they will thus be considered. As a general rule, an injunction will not lie to restrain a libel (Advance Music Corp. v American Tobacco Co., 183 Misc 645) except where the publication is made as part and parcel of a course of conduct deliberately carried on to further a fraudulent or unlawful purpose (West Willow Realty Corp. v Taylor, 23 Misc 2d 867). Dr. Fiore has shown neither defamation nor fraudulent or illegal purpose. Plaintiffs trial testimony was absolutely privileged (Pecue v West, 233 NY 316), his presentation of his grievance to the corporation was qualifiedly so (Andrews v Gardiner, 224 NY 440) and little evidence has been produced of statements made outside these two forums. The application for injunctive relief must be denied.
Also reserved by Mr. Justice Scileppi for the trial court was the question of Dr. Fiore’s standing to enforce the restrictive covenant against the plaintiff on his own behalf. Dr. Fiore asserts in his brief that he is entitled to enforcement because he is a creditor beneficiary. A third party is a creditor beneficiary if the promisee’s expressed intent is that the third party shall receive the performance in satisfaction and discharge of some actual or supposed duty or liability of the promisee to the third party (4 Corbin, Contracts, § 779C). "Intent” is the operative word. It is not enough that the contract will benefit the third party (Morgan v Ebco Mach. Corp., 239 App Div 346); there must in addition be a "clear intent” that the *458 creditor be benefited (Merchants Mut. Cas. Co. v United States Fid. & Guar. Co., 253 App Div 151). Although a contract between a principal and agent is seldom regarded as for the benefit of a third person since an agency can be revoked (4 Corbin, Contracts, § 779), there are exceptions where intent to benefit and to give the third party the right to enforce the contract in his own behalf is explicitly stated (see, e.g., Kessler v A. W. Haile Motor Co., 127 Misc 413). A collective bargaining agreement between a union and an employer can be enforced by an employee (see, e.g., Helt v Britten-Fenton Co., 180 Misc 1077; Levine v Meizel, 34 NYS2d 561) but in that situation, too, the intent to benefit is obvious. In the case of an employee covenant not to compete after termination of employment, it cannot be so readily assumed that the intent of the promisee is to confer a benefit upon an individual employee. An employer’s clients "belong” to it and the employer itself is entitled to the protection of the covenant. The instant employment agreement states that "any breach by the Employee of any of the provisions of this Employment Agreement will cause irrevocable injury and damage to the Company * * * and * * * the Company shall be entitled to injunctive and other equitable relief to prevent such breach” (emphasis supplied). Furthermore, the agreement contains provisions for enforcement only after approval of four-fifths of the shareholders where a discharged employee is involved. The agreement contains no language expressive of a "clear intent” to benefit individual employees or to provide them with individual causes of action. The right to assign employees to the various groups was reserved to the corporation and Dr. Fiore (like the plaintiff) could have been assigned anywhere. The fact that he happened to have been assigned to the east end group gives him no more rights in that practice than the plaintiff has. Dr. Fiore is merely an incidental beneficiary lacking standing to enjoin competition by the plaintiff (cf. Stafford v Polar S. S. Corp., 44 NYS2d 509, affd 269 App Div 946).
THE ACCOUNTING
In its counterclaim RHS demands an accounting by plaintiff with respect to the funds which have accumulated since his resignation. Since the parties are in a fiduciary relationship and no misconduct on the part of RHS has been proven, it is entitled to an accounting (see 1 NY Jur, Accounts and Accounting, § 20). At issue are the sums received by plaintiff *459 from the Hampton Medical Center and the East Hampton Medical Group and the funds held in escrow by the Southampton Hospital. Plaintiff was entitled to his salary from RHS for the 90-day period following his resignation and is entitled to remuneration on a quantum meruit basis for services subsequently rendered but he must account for all sums received. Since the record is insufficient for a determination by this court, the accounting itself must be the subject of a reference.
Settle judgment: (1) dismissing the complaint; (2) granting judgment to the defendant RHS on its counterclaim for enforcement of the restrictive covenant and for an accounting; (3) providing for a reference relative to the accounting itself; and (4) dismissing the defendant’s cause of action for damages.