**WELLSPAN HEALTH, York Hospital and WellSpan Medical Group, Appellants,**

v.

**Phillip BAYLISS, M.D., Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 13, 2004.

Filed Feb. 22, 2005.

Michael M. Mustokoff, Philadelphia, for appellants.

Anne E. Zerbe, York, for appellee.

BEFORE: FORD ELLIOTT, JOYCE and BECK, JJ.

OPINION BY BECK, J.:

¶ 1 In this appeal the issues of protectable business interest and requirements for a permanent injunction, within the context of a physician non-competition covenant, are brought before the court. Appellant WellSpan Health seeks review of an order which granted in part and denied in part its petition for a permanent injunction against a physician ex-employee, who was practicing his subspecialty in breach of his non-competition covenant. We affirm.

— FACTS —

¶ 2 WellSpan is a not-for-profit health-care system based in York, Pennsylvania that serves patients in south central Pennsylvania and northern Maryland. The primary components of WellSpan are Gettysburg Hospital and York Hospital. The latter is a teaching hospital with a number of training components, including residency programs.

¶ 3 In 1993, WellSpan recruited Philip Bayliss, M.D., a perinatologist, to York Hospital. Perinatology, a specialized medical practice focused on the management of high risk pregnancies, is a subspecialty of maternal fetal medicine, which is in turn a subspecialty of obstetrics/gynecology. Dr. Bayliss was hired as the Medical Director of the Perinatal/Genetic Program at York Hospital and the Associate Residency Program Director for Obstetrics. He subsequently also became York Hospital's Director of the Maternal Fetal Medicine Division and a member of the Medical Executive Committee at WellSpan. By these appointments, Dr. Bayliss served as a member of the WellSpan management team, participating in business strategy and marketing sessions.

¶ 4 Prior to his recruitment by WellSpan, Dr. Bayliss had served in the U.S. Army Medical Corps in Texas and Germany. He had no contact with south central Pennsylvania prior to his recruitment by WellSpan.

¶ 5 Shortly before starting work at York Hospital, Dr. Bayliss signed a professional services agreement that included a post-employment non-competition covenant (or restrictive covenant). By the terms of the covenant, Dr. Bayliss agreed not to engage in the practice of perinatology in York County or its four contiguous counties (Lancaster, Dauphin, Cumberland, and Adams) for two years after termination of his employment.

¶ 6 York Hospital's Maternal Fetal Medicine Division expanded under Dr. Bayliss to include two additional physicians and new equipment. At Dr. Bayliss's recommendation, Kimberly Heller, a board certified perinatologist, was hired in 1994, and Uma Reddy, a candidate for board certification in maternal fetal medicine, was hired in 2002 to work four days a week. WellSpan also hired other personnel for the program, including technicians, genetics counselors, and nurses. In the last five years, WellSpan spent approximately $900,000 in capital equipment for its Maternal Fetal Medicine Division.

¶ 7 WellSpan promoted the Maternal Fetal Medicine Division and Dr. Bayliss with marketing strategies, including advertisements to increase the number of referrals. As a specialized medical practice, maternal fetal medicine is dependent upon a strong referral base for its viability. One type of promotion was a videotape in which Dr. Bayliss was prominently featured. Dr. Bayliss created referral linkages with physicians at Memorial Hospital, in York County; Hanover Hospital, in York County; and Gettysburg Hospital, in Adams County.

¶ 8 In June 2001, Lancaster General Hospital opened a new Women and Babies Hospital (WBH) in Lancaster County, approximately 26 miles from WellSpan. WellSpan recognized a competitive threat to its obstetrics practice, particularly in east York County, from this new facility. As early as 1999, WellSpan and Dr. Bayliss had contemplated some type of expansion into Lancaster County. In August 2001, Drs. Bayliss and Heller presented to WellSpan a plan to expand maternal fetal medicine services to Lancaster County. However, WellSpan did not take steps, beyond discussion of possible strategies

and plans, to create a physical presence in Lancaster County.

¶ 9 In February 2003, Dr. Bayliss announced his resignation from WellSpan, effective June 30, 2003, and his intention to establish a maternal fetal medicine practice at WBH in Lancaster County, beginning on July 1, 2003. Several WellSpan staff members were recruited to Dr. Bayliss's new practice.

— THE INJUNCTIONS —

¶ 10 On June 17, 2003, WellSpan filed a motion for preliminary injunction seeking enforcement of the restrictive covenant signed by Dr. Bayliss and also a complaint alleging breach of contract. Regarding the motion for preliminary injunction, the court held hearings on July 3 and 14, 2003 and issued an order on August 12, 2003, denying in part and granting in part WellSpan's motion. The trial judge upheld the restrictive covenant with regard to York and Adams Counties, forbidding Dr. Bayliss from engaging in the practice of perinatology in those counties and from soliciting referrals of perinatology patients from physicians in those counties until June 30, 2005. However, the trial judge refused to enforce the covenant in Lancaster, Dauphin, or Cumberland Counties, based on his conclusion that WellSpan did not compete for perinatology patients in those counties. He held that the covenant, as applied to geographical areas where WellSpan did not provide perinatology care, was unreasonable and hence unenforceable. The order also enjoined Dr. Bayliss from soliciting any past or present WellSpan perinatology patients and from using or disclosing any information pertaining to WellSpan's past or present patients, except as requested by the patient.

¶ 11 On October 1, 2003, WellSpan filed a petition for permanent injunction, again seeking enforcement of the non-competition covenant. Both parties agreed to rely on the record and stipulations from the preliminary injunction hearings for purposes of the permanent injunction proceedings. The trial court issued its order regarding WellSpan's permanent injunction petition on February 25, 2004. This order contained the same terms as the preliminary injunction order and was based on the same reasoning—that WellSpan and WBH did not compete for maternal fetal medicine patients in each other's counties. WellSpan filed a timely appeal of the February 25, 2004 order, particularly as it applies to Lancaster County.

¶ 12 To prevail in a claim for a permanent injunction, the plaintiff must prove a "clear right to relief." *Buffalo Township v. Jones,* 571 Pa. 637, 644, 813 A.2d 659, 663 (2002), *cert. denied,* 540 U.S. 821, 124 S.Ct. 134, 157 L.Ed.2d 41 (2003). The injury claimed must be one that cannot be compensated by an award of damages. *Peugeot Motors of America, Inc. v. Stout,* 310 Pa.Super. 412, 456 A.2d 1002, 1008–09 (1983). However, in contrast to a preliminary injunction, a permanent injunction does not require a showing of irreparable harm or the need for immediate relief. *Buffalo Township, supra* at 644, 813 A.2d at 663. Rather, the plaintiff must show that an actual and substantial injury has occurred and/or is threatened in the future. *Peugeot Motors, supra* at 1008. As our Supreme Court has summarized, a permanent injunction is appropriately awarded "to prevent a legal wrong for which there is no adequate redress at law." *Buffalo Township, supra* at 644, 813 A.2d at 663 (quoting *Soja v. Factoryville Sportsmen's Club,* 361 Pa.Super. 473, 522 A.2d 1129, 1131 (1987)).

¶ 13 Appellate review of the grant or denial of a permanent injunction is limited to determining whether the trial

court committed an error of law.[1] *Id.* at 644 & n. 4, 813 A.2d at 663–64 & n. 4. In reviewing a question of law, our standard of review is de novo and our scope is plenary. *Id.* at 644 n. 4, 813 A.2d at 664 n. 4.

¶ 14 In the present case, to prevail in its petition for a permanent injunction, appellant WellSpan must prove that it has a clear right to relief under the post-employment non-competition covenant signed by Dr. Bayliss. WellSpan also must demonstrate that his breach of the covenant has caused or will cause actual and substantial injury to WellSpan for which there is no adequate legal remedy.

## — NON–COMPETITION COVENANT —

¶ 15 Pennsylvania courts have historically been reluctant to enforce contracts that place restraints on trade or on the ability of an individual to earn a living; however, post-employment non-competition covenants are not *per se* unreasonable or unenforceable. *See, e.g., Hess v. Gebhard & Co., Inc.,* 570 Pa. 148, 157–60, 808 A.2d 912, 917–18 (2002); *Insulation Corporation of America v. Brobston,* 446 Pa.Super. 520, 667 A.2d 729, 733 (1995).

¶ 16 The non-competition covenant at issue sought to prevent Dr. Bayliss from practicing in York, Adams, Lancaster, Dauphin, and Cumberland counties. The trial court held that the covenant was enforceable in York and Adams counties, but not in Lancaster, Dauphin, or Cumberland counties.[2] Only the decision with regard to Lancaster County, the location of Dr. Bayliss' new employer, is appealed, and hence we focus on that county.

### a. Protectable Interests

■ ¶ 17 At a minimum, for a non-competition or restrictive covenant to be enforceable, it must be "reasonably related to the protection of a legitimate business interest." *Hess, supra* at 160, 808 A.2d at 918. The type of interests that have been recognized in the context of a non-competition covenant include trade secrets or confidential information, unique or extraordinary skills, customer good will, and investments in an employee specialized training program. *Id.* at 163, 808 A.2d at 920; *Pennsylvania Funds Corp. v. Vogel,* 399 Pa. 1, 7–8, 159 A.2d 472, 475–76 (1960). In contrast, a post-employment covenant that merely seeks to eliminate competition *per se* to give the employer an economic advantage is generally not enforceable.

---

1. In *Buffalo Township, supra,* our Supreme Court distinguished the standard of appellate review for permanent versus preliminary injunctions. In reviewing preliminary injunctions, the standard is "whether the trial court abused its discretion or committed an error of law," while the standard for permanent injunctions is solely whether the trial court committed an error of law. *Id.* at 644 n. 4, 813 A.2d at 664 n. 4. The court's rationale for this difference in the standards of review stems from the difference in the tests for issuance of the two types of injunctions. *Id.* A preliminary injunction, but not a permanent injunction, requires a showing of the need for immediate relief to prevent irreparable harm. *Id.* at 663.

2. It is well-established in Pennsylvania that a court of equity has the authority to reform a non-competition covenant in order to enforce only those provisions that are reasonably necessary for the protection of the employer. *See Hess v. Gebhard & Co., Inc.,* 570 Pa. 148, 162–63 & n. 7, 808 A.2d 912, 920 & n. 7 (2002); *Sidco Paper Co. v. Aaron,* 465 Pa. 586, 594–95, 596 n. 8, 351 A.2d 250, 254–55 & n. 8 (1976); *Mrozek v. Eiter,* 805 A.2d 535, 539 (Pa.Super.2002), *appeal denied,* 573 Pa. 691, 825 A.2d 639 (2003). *See also Hillard v. Medtronic, Inc.,* 910 F.Supp. 173, 176–77 (M.D.Pa. 1995) (concluding that overwhelming Pennsylvania authority supports the principle that a court sitting in equity may reform or "blue pencil" or "blue-line" a non-competition covenant).

*Hess, supra* at 160, 163, 808 A.2d at 918, 920–21. The presence of a legitimate, protectable business interest of the employer is a threshold requirement for an enforceable non-competition covenant. *Id.* at 163, 808 A.2d at 920.

¶ 18 The interest protected under the umbrella of goodwill is a business's positive reputation. *Hess, supra* at 165, 808 A.2d at 922 (citing *Solomon v. Solomon,* 531 Pa. 113, 611 A.2d 686, 692 (1992)). "[G]oodwill represents a preexisting relationship arising from a continuous course of business which is expected to continue indefinitely." *Butler v. Butler,* 541 Pa. 364, 372 n. 9, 663 A.2d 148, 152 n. 9 (1995). A business's goodwill is considered a protectable interest even when the goodwill has been acquired through the efforts of an employee. *Sidco Paper Co. v. Aaron,* 465 Pa. 586, 591–93, 351 A.2d 250, 252–53 (1976).

¶ 19 The concept of customer goodwill as a protectable interest has been applied to patient relationships when the non-competition covenant at issue involves a health care professional. In *Hayes v. Altman,* our Supreme Court considered whether to enforce a non-competition covenant that barred an optometrist from practicing his profession within a radius of six miles of his former employer for three years after termination of employment. 424 Pa. 23, 29, 225 A.2d 670, 673 (1967); *see also Sidco Paper, supra* at 593 n. 4, 351 A.2d at 253 n. 4 (explaining *Hayes* ); Standard Pennsylvania Practice § 83:129 (2004). The Court upheld the covenant, finding its terms reasonably necessary for the protection of the employer's existing patient relationships. *Hayes, supra* at 28–29, 225 A.2d at 672. In a more recent example, this Court cited the erosion of the ex-employer's patient relationships as one factor in the decision to affirm the grant of a preliminary injunction against an oncologist. *West Penn Specialty MSO, Inc. v. Nolan,* 737 A.2d 295, 299 (Pa.Super.1999).

¶ 20 A second protectable interest recognized by our Supreme Court is confidential information or a trade secret. A trade secret may include "a compilation of information which is used in one's business" that gives one "an opportunity to obtain an advantage over competitors." *Christopher M's Hand Poured Fudge v. Hennon,* 699 A.2d 1272, 1275 (Pa.Super.1997), *appeal denied,* 553 Pa. 686, 717 A.2d 1026 (1998) (quoting *Felmlee v. Lockett,* 466 Pa. 1, 9, 351 A.2d 273, 277 (1976), in turn quoting *Restatement (First) of Torts* § 757 cmt. B). A trade secret does not include an employee's aptitude, skill, dexterity, manual and mental ability, or other subjective knowledge. *Id.* at 1275 (quoting *Pittsburgh Cut Wire Co. v. Sufrin,* 350 Pa. 31, 35, 38 A.2d 33, 34 (1944)). In addition, if a competitor could obtain the information by legitimate means, it will not be given injunctive protection as a trade secret. *Tyson Metal Products, Inc. v. McCann,* 376 Pa.Super. 461, 546 A.2d 119, 122 (1988).

¶ 21 A third protectable interest, recognized by our Supreme Court in *Pennsylvania Funds Corp. v. Vogel,* is the "efforts and moneys" invested by an employer to provide to its employees specialized training in the methods of the employer's business.[3] 399 Pa. 1, 8, 159 A.2d 472 (1960). The defendant in *Vogel* was a salesman of securities who had received extensive and continuous training from his employer,

---

**3.** *Vogel* was decided in 1960 and thus predates the explicit protected interest analysis described in *Hess, supra.* However, the *Vogel* analysis is sufficiently similar that we think it can be cast as recognizing and then conferring protection on an employer's protected interest.

particularly with respect to methods and problems in the sale of mutual fund shares. He then voluntarily left his position with his employer and started his own business selling mutual fund shares. The *Vogel* court enforced the non-competition covenant at issue, enjoining the defendant from engaging in the business of selling mutual fund shares in Pennsylvania. The court found merit in the argument that it would be inequitable for the defendant to start a new business in direct competition with his ex-employer after having received extensive, specialized training in the methods and problems of the business directly from his ex-employer. *Id.* at 7–8, 159 A.2d at 475–76.

¶ 22 An issue that has not as yet been explicitly addressed by a Pennsylvania appellate court is whether a patient referral base and the investments needed to generate that base constitute a protected interest. However, an appellate court in New Jersey has directly confronted this issue. In *Community Hospital Group v. More*, the New Jersey court recognized a medical institute's patient referral base as a legitimate, protectable interest. 365 N.J.Super. 84, 838 A.2d 472, 481–82 (App.Div.2003). The plaintiff in *More* was a not-for-profit neuroscience institute whose mission comprised specialized clinical care, physician training, and research. As a tertiary care provider of highly specialized medical services, it actively sought and depended on patient referrals from physicians in other specialties. The continued viability of all its programs was entirely dependent on the maintenance of a broad referral base and the case diversity thereby generated. *Id.* at 475, 481.

¶ 23 Recognizing a threat to the neuroscience institute's framework through the erosion of its referral base, the *More* court enforced a non-competition covenant against the neurosurgeon-defendant who

had voluntary left the employ of the institute in 2002. The institute had recruited the neurosurgeon in 1994, fresh from his residency, to a new geographical area, supporting and promoting him and his new practice, while he gained a local reputation and established a referral base. *Id.* at 475–77. The court noted the significant investment that the institute had made in the defendant, who, as an entry-level physician, did not have a patient following when he was recruited. *Id.* at 477, 487–89. Such an investment is not truly compensable through monetary damages when the referral base depends on the network of professional relationships that have developed over time between referring physicians and the particular subspecialist physician. *See id.* at 481.

¶ 24 The *More* court found several public policy reasons to recognize a patient referral base as a protected interest and to give legal protection to a hospital's investments in the generation of such a base. Without some legal protection of their investments, in young, subspecialty physicians, hospitals would be less likely to make the investments necessary to recruit such physicians and to provide them with the support needed to establish their referral-based practices. *Id.* at 487–89. The result would likely be a shortage of subspecialty physicians. *See id.* at 487–88. In addition, the *More* court expressed concern that, without legal recognition as a protected interest, the referral bases of an institution that provides highly specialized medical care could erode, causing serious harm not only to clinical care, but also to physician training and research programs, all of which benefit the public. *Id.* at 488–89.

■ ¶ 25 We find much merit in the holding and arguments from the *More* court regarding the wisdom of recognizing a patient referral base as a protected in-

terest and of protecting the investments required to develop such a base. Furthermore, in the context of a non-competition covenant, we think that the referral bases of a specialized medical care institution are analogous to a physician's patient relationships or an employer's customer relationships. Viewed in such light, recognition of a patient referral base as a protected interest fits squarely within Pennsylvania case law.

¶ 26 While finding *More* persuasive, we are also aware of the contrary argument: recognition of an employer's protected interest in its referral base and the investments needed to generate that base may discourage some physicians from practicing in our state, because they perceive the recognition as a barrier to physician mobility. However, we reiterate that establishment of a protectable interest satisfies *only* the threshold question in a non-competition covenant dispute. *See Hess, supra* at 160, 163, 808 A.2d at 918, 920. If a protected interest is found, the court must apply the balancing test articulated in *Hess,* giving appropriate weight to the paramount interest of the public, as described in detail in the following section. *See Hess, supra* at 163, 808 A.2d at 920; *New Castle Orthopedic Assoc. v. Burns,* 481 Pa. 460, 469, 392 A.2d 1383, 1387 (1978).

#### b. Balancing Test

¶ 27 If the threshold requirement of a protectable business interest is met, the next step in analysis of a non-competition covenant is to apply the balancing test defined by our Supreme Court. *Hess, supra* at 163, 808 A.2d at 920. First, the court balances the employer's protectable business interest against the employee's interest in earning a living. Then, the court balances the employer and employee

interests with the interests of the public. *Id.*

¶ 28 In weighing the competing interests of employer and employee, the court must engage in an analysis of reasonableness. First, the covenant must be reasonably necessary for the protection of the employer. *Hess, supra* at 157, 808 A.2d at 917. In addition, the temporal and geographical restrictions imposed on the ex-employee must be reasonably limited. *Id.; Brobston, supra* at 733–34. The determination of reasonableness is a factual one, requiring consideration of all the facts and circumstances, with the party claiming unreasonableness as a defense against enforcement of the covenant bearing the burden of proof. *Brobston, supra* at 733–34; *Jacobson & Co. v. International Environment Corp.,* 427 Pa. 439, 451–52, 235 A.2d 612, 619–20 (1967). An unreasonable covenant will not be enforced. *Jacobson, supra* at 451, 235 A.2d at 619.

¶ 29 Although the public interest is sometimes neglected in the balancing of employer and employee concerns, *see Hess, supra* at 159, 808 A.2d at 918, the interests of the public are of paramount importance in the context of non-competition covenants for physicians. Our Supreme Court has made clear that the courts will undertake a "close judicial scrutiny" of non-competition covenants involving physicians because of the value of their services to the public. *New Castle Orthopedic, supra* at 464, 392 A.2d at 1385. In *New Castle Orthopedic,* evidence of long delays experienced by patients who attempted to obtain appointments for orthopedic services led the court to conclude that there was a shortage of orthopedic specialists in the geographic area. This was the major factor in the court's decision to reverse the grant of a preliminary injunction against an orthopedic physician-surgeon. *Id.* at 467–68, 392 A.2d at 1387.

■ ¶ 30 In *West Penn,* this Court concluded that the public interest analysis of non-competition covenants involving physicians requires a determination of the "quantitative sufficiency of physicians practicing in the restricted area ...." *West Penn, supra* at 300–01 (citing *New Castle Orthopedic, supra*).[4] When patient demand in the geographical region in question exceeds the ability of appropriately trained physicians to provide expeditious treatment, then the public interest predominates over the right to enforce a non-competition covenant by injunction. *Id.* The *West Penn* court cited the presence of numerous oncologists in the area and no evidence of a shortage of oncology services in affirming a grant of a preliminary injunction against an oncologist. *Id.* at 301.

■ ¶ 31 These cases show that public interest can be the determinative factor in the balancing test which determines enforceability of a non-competition covenant as applied to a health care provider. As our Supreme Court has stated, "[p]aramount to the respective rights of the parties to the [physician non-competition] covenant must be its effect upon the consumer who is in need of the service." *New Castle Orthopedic, supra* at 469, 392 A.2d at 1387. The court must analyze whether enforcing the covenant would compromise patients' ability to obtain adequate skilled care in the geographical area in which the health care provider is planning to work. In other words, the court must evaluate the likelihood that consumers could be adequately served by existing health care providers, including alternate health care providers that the employer has on staff or can readily hire to meet patient demand. The interests of the public are paramount. Whether the court respects those interests by granting or denying the injunction or by blue lining[5] the restrictive covenant is dependent on the facts of the case and within the discretion of the court.

— RELIEF CRAFTED —

■ ¶ 32 In the present case, the trial judge awarded partial relief to WellSpan. The court enforced the covenant as it applied to York and Adams counties, but refused to enforce it in Lancaster, Dauphin, and Cumberland counties, despite WellSpan's claim, made expressly or by inference, that it had several protectable interests in all five counties.

¶ 33 After examination of the certified record, we find WellSpan identified three legitimate protectable interests in its claim—its patient relationships, its referral base and the confidential information pertaining to its past and present patients. Given these legitimate protectable interests, the next step in the analysis is to balance the interests of WellSpan and Dr. Bayliss, under a standard of reasonableness of the covenant. Then, those interests must be balanced against the paramount interest of the public in access to health care.

---

4. In *West Penn, supra* at 301, this Court noted that our Supreme Court had cited with favor numerous opinions from other jurisdictions in which the analysis focused on whether the number of physicians practicing the relevant specialty in the geographical area could meet patient demand. *See New Castle Orthopedic, supra* at 468–69, 392 A.2d at 1387 (citing *Middlesex Neurological Associates, Inc. v. Cohen,* 3 Mass.App.Ct. 126, 324 N.E.2d 911 (1975) (involving neurosurgeon); *Horne v. Radiological Health Services,* 83 Misc.2d 446, 371 N.Y.S.2d 948 (1975) (involving radiologist); *Cogley Clinic v. Martini,* 253 Iowa 541, 112 N.W.2d 678 (1962) (involving orthopedic surgeon); *Foltz v. Struxness,* 168 Kan. 714, 215 P.2d 133 (1950); *Wilson v. Gamble,* 180 Miss. 499, 177 So. 363 (1937)).

5. *See supra* note 2.

### a. Practice of Perinatology/Solicitation of Referrals

¶ 34 The trial court enjoined Dr. Bayliss from practicing perinatology in York or Adams Counties and from soliciting referrals from York or Adams County physicians. However, the trial judge refused to enforce the covenant in Lancaster County, based on his conclusions that WellSpan did not compete in Lancaster County for maternal fetal medicine patients and, conversely, that WBH (Dr. Bayliss's new employer) did not compete in York County for such patients.

¶ 35 Because WellSpan did not compete in Lancaster County, the trial court found the non-competition covenant to be unreasonable and hence unenforceable with regard to that county. We agree with the trial court that a non-competition covenant applied to a geographical area in which the employer does not compete is unreasonable. Our case law makes clear that, to be enforceable, a non-competition covenant must be reasonably necessary for the protection of the employer. *Hess, supra* at 157, 808 A.2d at 917. If, as the trial court found here, an employer does not compete in a particular geographical area, enforcement of a non-competition covenant in that area is not reasonably necessary for the employer's protection.

¶ 36 The trial court cited at least two stipulated facts as well as other competent evidence in support of its conclusion that WellSpan did not compete with WBH and Dr. Bayliss in Lancaster County. The parties stipulated that WellSpan did not have any offices, nor did it provide maternal fetal medicine services, in Lancaster County. Evidence was presented that in 2002, no more than 1% of WellSpan's new maternal fetal medicine patients came from Lancaster County. Only a small percentage of WellSpan's maternal fetal medicine patients were referred by Lancaster County physicians. Conversely, less than 2% of obstetrics patients treated at WBH came from York County. Thus, in sum, ample competent evidence was presented to support the court's conclusions that WellSpan and WBH were not competitors and that WellSpan did not compete in Lancaster County.

¶ 37 WellSpan takes issue with some of the trial court's factual conclusions. For example, WellSpan claims that the trial court, in concluding that WellSpan and WBH were not competitors, overlooked the fact that 7.92% of WellSpan's maternal fetal medicine patients resided in either eastern York or western Lancaster Counties (and thus were close to WBH). As an appellate court, we are bound by the trial court's findings of fact for which there is competent evidence in the record. *Peugeot Motors, supra* at 1005. Furthermore, the trial judge, not the appellate court, is in the best position to resolve conflicts in testimony, since he or she had the opportunity to see and hear the witnesses. *Id.* Our review of the entire record, giving appropriate deference to the trial court as we must, indicates that the trial court's factual conclusions are supported by competent evidence and do not constitute an abuse of discretion.[6]

6. WellSpan also takes issue with the trial court's reliance on the following statistics: "[l]ess than 2% of all York County residents receiving surgical care receive such care from [Lancaster General Hospital]; and less than 1% of all Lancaster County residents receiving surgical care receive such care from [WellSpan]." Trial Court Order, Feb. 25, 2004 at 4. WellSpan contends that these statistics—for general surgical patients—are not relevant to referral patterns for maternal fetal medicine patients. However, evidence was presented that no more than 1% of WellSpan's maternal fetal medicine patients came from Lancaster County and only a small percentage of WellSpan's maternal fetal medi-

¶ 38 The trial court also properly considered the public interest in its decision. The public interest strongly militates against enforcement of the covenant in Lancaster County. Dr. Bayliss was the only perinatologist in Lancaster County, a fact that led the court to infer that he would have more than enough work just caring for residents of that county. This inference was supported by the fact that York County, which has fewer residents than Lancaster County,[7] provides enough work for more than one perinatologist. Undisputed evidence indicated that the area was underserved in the area of maternal fetal medicine.[8]

¶ 39 Thus, based on well-founded factual conclusions, the trial court determined that the non-competition covenant, as applied to Lancaster County, was unreasonable and against the public interest. The court therefore used its authority to blue-line the covenant, refusing to enforce it in Lancaster County. However, in York and Adams counties, where the restrictions on Dr. Bayliss's practice and solicitation of referrals were reasonably necessary for WellSpan's protection, the court enforced the covenant. We find no error in the trial court's ruling.

### b. Use or Disclosure of Information

∎ ¶ 40 The trial court also granted WellSpan partial relief with regard to use or disclosure of confidential information. Specifically, the court enjoined Dr. Bayliss from using or disclosing any information pertaining to WellSpan's past or present patients, but it refused to extend the injunction to other types of information.[9] In limiting the type of information protected by injunction, the trial court made several determinations: that WellSpan had not carried its burden to prove that the information in question was confidential or a trade secret and that WellSpan had not proven that disclosure of the information would result in harm to WellSpan. We find no error in the trial court's holding.

¶ 41 Conflicting testimony was presented by the parties regarding the issue of confidential information or trade secrets. For example, WellSpan argued that expense projections sent by Dr. Bayliss to WBH in January 2003 included confidential information and thus were improperly disclosed. In response, Dr. Bayliss contended that he devised the projections based on his general knowledge of the practice of maternal fetal medicine and on other information, such as birth and pregnancy statistics, available to the public. The trial court is in the best position to judge witness credibility and to make factual determinations based on conflicting testimony. *Peugeot Motors, supra* at 1005. In this case the trial court found Dr. Bayliss's argument more credible. In addition, the trial court stated that WellSpan had made no clear showing that the

cine patients were referred by Lancaster County physicians. A logical and reasonable inference from all these data is that Lancaster County physicians rarely refer either surgical or maternal fetal medicine patients to WellSpan.

7. The court noted that Lancaster County's population was 470,658, while that of York County was 381,751, as of December 2001.

8. Undisputed testimony was presented that WBH and York Hospital have approximately

4300 and 2800 deliveries per year, respectively. Other undisputed testimony indicated that one maternal fetal medicine specialist should be available for every 1,000 to 1,200 deliveries in an appropriately served area.

9. WellSpan sought to enjoin Dr. Bayliss from using or disclosing fees for services negotiated with insurance companies, as well as budget information (including calculations of salaries, benefits, taxes, and collections).

information at issue could not be legitimately obtained elsewhere. As an appellate court, we defer to these factual determinations by the trial court.

¶ 42 Since WellSpan failed to carry its burden of proof with regard to the confidential nature of the information at issue (with the notable exception of information pertaining to WellSpan's past or present patients), WellSpan cannot claim a protectable business interest in the confidentiality of that information. In the absence of a protectable business interest, WellSpan fails to meet the threshold requirement for an enforceable non-competition contract, and our inquiry into the use or disclosure of confidential information need extend no further.

¶ 43 In sum, we affirm the trial court's order granting in part and denying in part WellSpan's petition for a permanent injunction against Dr. Bayliss.

¶ 44 Order affirmed.