# SunGard Business Systems, LLC v. McCloskey

C.P. of Chester County, No. 2013-07190

*John J. Cunningham, IV* and *Mary-Ellen H. Allen*, for the plaintiff.
*Theodore Poretz* and *Adrienne M. Ward*, for defendants.

TUNNELL, *J.*, November 1, 2013—This case primarily concerns whether any restrictive covenants were violated after defendant McCloskey went to work for another employer and, if so, whether injunctive relief should be granted to the plaintiff at least preliminarily.

## A. PROCEDURAL HISTORY

The matter commenced on July 24, 2013 with the filing by SunGard Business Systems, LLC of a complaint seeking injunctive relief and monetary damages along with a motion for special and preliminary injunctions. Count I alleges a breach of noncompetition and nonsolicitation provisions contained in an amendment to defendant McCloskey's sales compensation agreement. Count II invokes the doctrine of inevitable disclosure. Count III sets forth a claim for unfair competition. Count IV is an action for promissory estoppel. Count V is an action for breach of fiduciary duty. All of these counts are against McCloskey. Count VI alleges tortious interference with

SunGard's contractual relations by defendants Innovest Systems and Administrative Systems, LLC.

Although not made parties, individuals named Charleton Moore, Natalie Wyatt and Jeffrey McCuen, who are former SunGard employees now employed by the defendants, are alleged to be using confidential information they acquired in order to compete against SunGard.

The court convened a conference on SunGard's motion for special injunction on August 1, 2013. It issued an order on the following day, August 2, 2013, essentially by agreement of the parties, enjoining McCloskey from selling or participating in the marketing of any products of defendant Innovest Systems, and from soliciting SunGard employees to leave SunGard to become employed by Innovest or Administrative Systems. The order permitted McCloskey to sell or participate in the marketing of Administrative Systems products pending further order of the court.

The hearing on the request for the preliminary injunction occurred October 15-16, 2013.

The court makes the following:

B. FINDINGS OF FACT

SunGard Business Systems, LLC

SunGard Business Systems, LLC is a subsidiary of SunGard. The parent company is a Fortune 500 multi-national company with 125 affiliates, 17,000 employees and over $4 billion in revenues in 2012. It sells some 350 software applications to a variety of businesses in the financial, educational and public sectors. It also provides continuity assurance and data center hosting among many other services.

SunGard Business Services, LLC (hereinafter "SunGard") offers software and IT services to the wealth management industry. Its TRUST suite of products includes Global Plus, which is accounting software marketed to very large banks and trust companies. Its Omni products include Omni Payments, which is a software system that automates, organizes and integrates a check writing and benefit disbursement process.

In the retirement sector, SunGard sells Relius software which does record-keeping and administrative solutions for employee benefit professionals. It can manage pension plans. Under the Relius umbrella, SunGard markets Government Forms, which generates Form 1099's and tax returns.

ASI and Innovest

Administrative Systems Inc. ("ASI Inc.") was a California corporation. Its main product was ASIPay, a software system used to write checks, process tax forms, and provide secure print and mail services to the employee benefits and retirement industry. Historically, ASIPay was used by financial institutions to complement and supplement the trading and record keeping platforms offered by larger companies including SunGard and SEI. In early 2013, it had about 30 employees and was owned by Bluff Point Associates, Inc. ("Bluff Point"), a private equity firm. On or about April 30, 2013, ASI Inc.'s shares were acquired by Administrative Systems, LLC ("ASI, LLC" or "ASI"), a company organized by Innovest. Upon the acquisition of its shares, ASI Inc. was dissolved. ASI, therefore, is now wholly owned by Innovest, although it operates as a separate, free-standing enterprise with separate executives, separate systems and a separate sales forces. ASIPay competes with Omni Payments, a product

of SunGard's Omni business unit. Robert Hickman ("Hickman") is ASI's CEO.

Innovest Systems, LLC ("Innovest"), based in New York, provides secure, integrated, real-time trust accounting and reporting systems to trust companies, wealth management firms and other institutions. It has about 50 employees. Innovest's trust platform competes with Global Plus, a product of SunGard's TRUST business unit. It does not compete with Omni Payments. William Thomas ("Thomas") is Innovest's CEO. Prior to April 30, 2013, Innovest was owned by a trust for the benefit of the children of the principal of Bluff Point. Following the acquisition of ASI Inc., Bluff Point became a member.

Innovest, although now ASI's parent, continues to be operated as a separate and freestanding enterprise. It maintains a separate sales force, dedicated to selling Innovest's products, independent of ASI, and the two sales forces do not interface. Recently, ASI and Innovest did merge one small component of their businesses, Relationship Management, for administrative efficiencies by having a single manager oversee each company's respective customer service staff. None of the individuals under scrutiny, McCloskey, Moore, Wyatt or McCuen, are involved in the relationship management function in any way.

In September 2012, Innovest and ASI Inc. entered into a distribution agreement, whereby Innovest agreed to seek to sell the ASI Pay product to Innovest customers as an additional capability, and ASI Inc. agreed to share with Innovest a percentage of the revenues that resulted from any successful distribution effort. On or about December 10, 2012, Innovest and ASI Inc. issued a press release to announce the distribution relationship. It was not clear

whether SunGard was aware of this.

Later in 2012, Innovest and ASI Inc. began to discuss a possible business combination and terms were reached around March 2013. By agreement dated April 30, 2013, Innovest acquired all of ASI Inc.'s shares and merged them into a new, wholly-owned subsidiary, ASI, LLC. Both entities are run separately.

McCloskey

Gregory B. McCloskey was a SunGard sales person until February 1, 2013, when he began work as Senior Vice President, Business Development, at ASI Inc. McCloskey worked within SunGard's TRUST business suite, selling Trust's Global Plus product. Global Plus is the trust accounting and reporting platform sold to the trust departments of very large financial institutions. He never sold Omni Payments, the SunGard product that is competitive with ASIPay, nor any other product of the Omni or Relius business suites.

McCloskey was hired by ASI, Inc. to seek out potential acquisition target companies as well as bring in opportunities for ASI Inc. to partner with other companies in the distribution of ASIPay, much like the distribution agreement Innovest and ASI Inc. entered into in 2012. In addition, McCloskey was assigned sales responsibilities for the ten (10) top Tier 1 financial institutions. This takes about 5% of his time. McCloskey estimates that since his departure from SunGard, 95% of his time has been spent in non-sales related pursuits, namely in seeking potential mergers and acquisitions.

McCloskey began seeking new employment in 2012, following a dispute over his 2011 compensation that consumed much of that year, culminating in McCloskey's

hiring his own counsel to deal with SunGard on his behalf. In late 2012, as part of a networking effort, he sent his resume to an old friend, Glen Schmidt, who was working at Innovest. Innovest and McCloskey both recognized that McCloskey could not become employed by Innovest by reason of a noncompetition provision contained in the Amended Compensation Plan for 2011 that resolved his 2011 compensation dispute. Instead, Innovest's CEO, Thomas, forwarded McCloskey's resume to ASI Inc.'s Hickman, who interviewed him for the open position of Vice President, Sales. At about the same time, ASI Inc. was also interviewing Moore for the position; Moore's resume had been forwarded by a headhunting firm. Neither knew that the other was being interviewed until very late in the process.

Ultimately, ASI Inc. concluded that both Moore and McCloskey were good candidates, and it was determined to offer the vice president sales position to Moore and to create a new position, senior vice president for business development, for McCloskey. McCloskey accepted the business development position on or about January 18, 2013, gave notice to SunGard, which included the fact that he was going to work for ASI Inc., and started work there on or about February 1, 2013.

McCloskey did not know that there had been discussions between ASI Inc. and Innovest over a potential merger until sometime after he left SunGard. He had no role in Innovest's decision to acquire ASI Inc.

As an ASI, LLC employee, McCloskey's role has not changed. He continues to devote himself substantially to seeking out business combinations and partnering opportunities for ASI. To the limited extent McCloskey is engaged in any sales (he estimates 5% of his time is

devoted to seeking sales opportunities from the ten (10) largest Tier 1 financial institutions) it is only for the ASIPay product. He does not sell (and has never sold) any Innovest products. Though he participates in ASI's regular sales conference calls, he does not participate in Innovest sales calls, and does not interface with its sales force. When he attends Innovest's Board of Director's meetings to report on his activities, he is excused when the discussion turns to Innovest sales.

SunGard contends that McCloskey should nonetheless be enjoined from working for ASI because (a) it violates the non-compete provision of the Amendment to the 2011 Sales Compensation Plan; (b) he will necessarily have to use SunGard's trade secrets in his role at ASI; and (c) he is barred from soliciting SunGard customers under the terms of a 1993 agreement executed between him and Premier Systems, a company SunGard later acquired.

The 2011 Amended Sales Compensation Plan

As a member of the Global Plus sales force, McCloskey's compensation consisted of a base salary and commissions for software systems he sold. In December 2010, as McCloskey was well along the way of making two large sales of Global Plus, McCloskey and his boss, Todd Moyer ("Moyer"), reached agreement on a commission structure for 2011; in essence, McCloskey and Moyer agreed that he would be paid 2% of all revenues he generated up to $20 million, and 3% of all revenues that exceeded $20 million. On that basis, McCloskey closed the first of the two deals in the first quarter of 2011, selling the Global Plus system to the Canadian Western Trust for a total contract value of $5.2 million.

In June 2011, McCloskey was delivered a written

copy of the Amendment to the 2011 Sales Compensation Plan, made retroactive to January 1, 2011. The written Sales Compensation Plan bore little resemblance to the compensation plan to which he felt he and Moyer had already agreed, and in reliance on which he had already closed one large contract. SunGard unilaterally decided that McCloskey would receive 2% of all revenues up to $27.5 million and required him to share 30% of these reduced revenues with a newly hired subordinate, who had played no significant role in either of the two sales efforts.

McCloskey rejected the proposed Amendment to the 2011 Sales Compensation Plan, but while he made his objections known, he continued seeking to close a much larger Global Plus transaction with another customer, Key Bank. Ultimately, he closed the Key Bank transaction in October 2011, a total contract value to SunGard of approximately $30.1 million.

Under McCloskey's agreement with Moyer, these two sales entitled McCloskey to compensation in the amount of $850,000. SunGard contends that under the retroactive Amendment to the 2011 Sales Compensation Plan, he would have been paid $288,606 less.

McCloskey and SunGard finally reached agreement in December 2011; except for a last minute reduction in the amount by $25,000, SunGard agreed to pay to McCloskey what SunGard, through Moyer, had agreed to pay him one year earlier. Though he felt he was entitled to $850,000, McCloskey ultimately agreed to accept $825,000 (for having obtained $35.1 million in revenue for SunGard). McCloskey left SunGard before the last $72,152.48 installment was paid, and therefore received only approximately $753,000 of the $825,000 he had

earned in commissions.

SunGard also requested that McCloskey agree to a post-employment noncompetition provision — he previously had no non-compete restriction of any kind with SunGard — and also to a nonsolicitation provision. Ultimately, McCloskey agreed. The four companies whose names appear in the non-compete provision, including Innovest, were suggested by McCloskey. SunGard never insisted on any of them by name or description.

In pertinent part, the Amendment to 2011 Sales Compensation Plan, dated December 5, 2011, provides that for twelve (12) months following the termination of his SunGard employment:

> [McCloskey] shall not...render any material services for any of the following companies or their affiliates or successors: FIS/Metavante Systems, Fi-Tek, Innovest Systems or Accutech Systems.

The terms "material," "affiliates" and "successors" were not defined in the Amendment. For the same 12-month period, McCloskey also agreed that he would not:

> solicit or contact, for the purpose or with the effect of competing or interfering with any business of the Company, (i) any customer or acquisition target under contract with the Company at any time during the two years preceding the termination date; (ii) any prospective customer or acquisition target that received or requested a proposal, offer or letter of intent from the Company at any time during the two years preceding the termination date; (iii) any affiliate of any such customer or prospect; or (iv) any of the individual customers or acquisition targets established by the Company, [McCloskey] or others at the Company

during the period of [McCloskey's] employment with the Company.

McCloskey testified that he understood that this provision applied only to competing with the business he did at SunGard, that is, Global Plus. Since ASI does not compete with Global Plus as well as the fact that he would not be particularly engaged in sales activities, he believed that his new employment did not constitute a violation of this provision. McCloskey has not solicited any entity to compete with the Global Plus business he did at SunGard.

Moore

Charleton ("Chip") Moore was employed as a salesperson in the Relius business unit of SunGard, headquartered in Jacksonville, Florida, primarily within its retirement segment.

SunGard asserts that Moore is bound by the terms contained in an Employment Agreement he executed on or about May 5, 1993 with Corbel & Co. ("the Corbel Employment Agreement"), a Florida corporation later acquired by SunGard in about 1997. Corbel was engaged in the business of selling software that created probate forms, a business that Moore was not involved in at SunGard, and with which he is not presently competing. In pertinent part, the Corbel Employment Agreement provides that for two (2) years following the termination of Moore's employment, he may not "render services on behalf of himself or any person organization or entity which is engaged in, or about to become engaged in, research on, development of, or marketing or selling of, any Trade Secrets... which resemble or compete with any Trade Secrets... that are used, published or sold by [Corbel & Co.]." The Corbel Employment Agreement

attaches as "Schedule A" a "Description of Corbel & Co. Business Activities," which specifies that Corbel prepares "(i) various types of legal forms and document preparation services; (ii) technical consulting advice concerning the services offered; (iii) an on-line computer system consisting of various functions and capabilities; and (iv) a computerized probate support systems."

SunGard also asserts that Moore is bound by "Exhibit A Restrictive Covenants" pursuant to the "Management Non-Qualified Time-Based Class A Option Agreement" (the "Option Agreement") Moore signed in exchange for SunGard options. Paragraph 8 of the Option Agreement, entitled "Forfeiture", provides that if "the Company determines that Optionee is not in compliance with one or more of the Restrictive Covenants...the Company may cancel any unexercised portion. The Company shall also have the following (and only the following) additional remedies…" The two exclusive remedies listed thereafter are a) "rescission" or clawback of "any gain realized upon the sale of any Shares acquired upon the exercise of the Option," and b) "the right to offset, against any Shares any cash amounts due to optionee...any amounts to which the Company is entitled as a result of Optionee's violation of the Restrictive Covenants…" Injunctive relief and money damages are excluded. SunGard has indicated that it will forfeit any options due to Moore by reason of his employment at ASI. McCloskey is also party to an Option Agreement with SunGard, and the same analysis applies. SunGard has forfeited, or is in the process of forfeiting, the SunGard options.

SunGard also asserts that Moore wrongfully solicited Wyatt, to whom she reported at SunGard, to join him at ASI. He did arrange for an interview for her at ASI, but

she had apparently expressed an interest to leave SunGard. The court was not persuaded that Moore enticed Wyatt in any way.

Wyatt

Natalie Wyatt was a salesperson in SunGard's Relius business unit. Wyatt was assigned only to new customer sales at Relius; her geographic territory covered a number of states. She joined ASI, LLC on or about July 1, 2013, and is exclusively engaged in the sale of ASIPay. She does nothing to compete with Relius.

Wyatt was the only one among the four persons under scrutiny who signed a standard SunGard Employment Agreement on or about July 7, 2006 (the "Wyatt Employment Agreement"). In pertinent part, the Wyatt Employment Agreement provides that for twelve (12) months, she will not compete "with any part of SunGard's ISS Business." The term "SunGard's ISS Business" (standing for SunGard's investment support systems business) is defined as:

> involv[ing] the provision of data processing and related services using SunGard's proprietary software and databases...including software for investment accounting, portfolio management, risk management, securities and derivative instrument trading and accounting, employee benefit plans, trust accounting, investment performance analysis, stock, bond and mutual fund accounting, general ledger accounting and any other investment support and financial applications, and all related software and services which SunGard may in the future develop internally or obtain through acquisition..."

As broad as this definition is, it says nothing about

check writing software, the only business of ASI, LLC, and its inapplicability is made clear by this important carve-out:

If my responsibilities are limited to a defined territory or market, then this noncompetition provision will apply only to the territory or market for which I was responsible during the last two years of my employment with SunGard.

Wyatt, who is selling check-writing software to retirement departments of financial institutions, is now engaged in an entirely separate "market" from the non-competing market she served while employed as a Relius salesperson for SunGard.

The Wyatt Employment Agreement also contains a nonsolicitation provision, which, for twelve (12) months, prevents her "for the purpose or with the effect of competing or interfering with or harming any part of SunGard's ISS Business" from soliciting "(1) any customer under contract with SunGard at any time during the last two years of [her] employment; (2) any prospect that received or requested a proposal or offer from SunGard at any time during the last two years of [her] employment; (3) any affiliate of any such customer or prospect; (4) any of the individual contacts established by SunGard or [Wyatt] or others at SunGard during [Wyatt's] employment at SunGard or (5) any SunGard employee or contractor."

No evidence was adduced during the preliminary injunction hearing that Wyatt has violated this provision, broad as it is, in any way, or that she is likely to. No SunGard customer has switched or threatened to switch to ASI as a result of her efforts. It bears mention that the term "SunGard's ISS Business" on its face seems

to include all financial software, whether or not Wyatt had anything to do with its sale, and categories of people whose identities Wyatt could not possibly know. There was no demonstration that she had any ability to know what prospect "received or requested a proposal" from SunGard in the last two years of her employment, who "the affiliates of any such customer and prospect" might be, or who the "individual contacts established by SunGard...or others" during her employment might be. This could undoubtedly be a list of thousands of people entirely unknown to Wyatt and explains why the Wyatt Employment Agreement expressly carved out her ability to work in a different "territory or market" from what she did at SunGard.

McCuen

Alone among the four ex-SunGard employees mentioned in the complaint, Jeffrey McCuen, a member of the sales force in the Omni business unit, left SunGard to join Innovest in February 2013.

It is undisputed that there is no non-compete or nonsolicitation agreement to which McCuen is a party. There is no evidence that Innovest "enticed" McCuen to join Innovest by raising his salary, or that he took any of SunGard's confidential documents with him. Indeed, at the hearing, the president of SunGard, Mike Rogalski, testified that McCuen was free to compete with them.

C. ANALYSIS OF THE RESTRICTIVE COVENANTS

A covenant not to compete is a restrictive covenant relied upon by employers to shield their protectable business interests, *J. C. Ehrlich Co., Inc. v. Martin*, 979 A.2d 862, 864 (Pa. Super. 2009), and "precludes the former employee from competing with his [her] prior employer for

a specified period of time and within a precise geographic area." *Hess v. Gebhart*, 570 Pa. 148, 157, 808 A.2d 912, 917 (2002). Although post-employment noncompetition agreements are not per se unenforceable, *Wellspan Health v. Bayliss*, 869 A.2d 990, 996 (Pa. Super. 2005), they "are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living." *Hess, supra*; *InterMetro Indus. Corp. v. Kent*, 2007 WL 1140637 at *5 (M.D. Pa. 2007). For that reason, covenants not to compete must be strictly construed against the employer. *All-Pak, Inc. v. Johnston*, 694 A.2d 347, 351 (Pa. Super. 1997); *Citadel Broad. Co. v. Gratz*, 52 Pa. D. & C.4th 534, 545 (Lacka. Cty. 2001).

Noncompetition covenants are enforceable under Pennsylvania law if: (1) the restrictive covenant is incident to an employment relationship between the parties; (2) the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and (3) the restrictions imposed are reasonably limited in duration and geographic scope. *See Hess, supra*; *J. C. Ehrlich Co., supra*; *Citadel Broad.*, 52 Pa. D. & C.4th at 544-45.

Consideration

To be effective, the noncompetition covenant must be supported by adequate consideration. *See Sidco Paper Co. v. Aaron*, 465 Pa. 586, 591, 351 A.2d 250, 252 (1976). If a covenant not to compete is executed at the inception of employment, the consideration supporting the covenant is the job itself. *See e.g., Barb-Lee Mobile Frame Co. v. Hoot*, 416 Pa. 222, 225-26, 206 A.2d 59, 61 (1965). However, when an employee enters into a noncompetition agreement subsequent to the commencement of employment, the restrictive covenant must be supported by new consideration in order to be

enforceable. *Maintenance Specialties, Inc. v. Gottus*, 455 Pa. 327, 330, 314 A.2d 279, 280 (1974); *Davis & Warde, Inc. v. Tripodi*, 420 Pa. Super. 450, 455, 616 A.2d 1384, 1387 (1992). Such new consideration must be in the form of some corresponding benefit to the employee or favorable change in employment status, *Ruffing v. 84 Lumber Co.*, 410 Pa. Super. 459, 466, 600 A.2d 545, 548 (1991), as in the case of a promotion, *see Records Ctr., Inc. v. Comprehensive Management, Inc.*, 363 Pa. Super. 79, 85, 525 A.2d 433, 435-36 (1987), or an increase in pay. *See Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 2009 W.L. 159182 (2009), *affirmed in part, vacated in part*, 592 F.3d 412 (3d. Cir. 2010) at *11; *Citadel Broad.*, 52 Pa. D. & C.4th at 546.

McCloskey argues that the restrictive covenants were not supported by adequate and separate consideration, appearing as they did for the first time in the amendment to the 2011 Sales Compensation Plan. He was emphatic in his view that his employer at the time, SunGard, had welshed on a deal previously struck. The court was in no position to adjudge that, and was reticent to go behind the document itself. What was clear is that both McCloskey and SunGard, through their respective counsel, hammered out an arm's length transaction over a period of time, ultimately producing the amendment dated December 5, 2011. That agreement, in its preface, recites:

WHEREAS, the parties dispute the terms that apply to commissions earned by Employee in 2011;

WHEREAS, the parties wish to resolve their dispute over the applicable commission plan for Employee for 2011.

After its execution, Mr. McCloskey remained an

employee for a number of weeks.

It cannot seriously be gainsaid that the agreement, and the restrictive covenants contained therein, were not "incident" to an employment relationship. The court interprets the document to be a settlement agreement, negotiated and bargained for by counsel for the parties. This court has no intention of inquiring into the sufficiency of the consideration, in the absence of fraud. *Bayne v. Proctor & Gamble Distrib. Co.*, 87 Pa. Super. 195, 202 (1926), noting that a very slight advantage to one party is sufficient consideration to support a contract. Mutual promises made mutually binding are sufficient consideration to support a contract. This contract recites that "INTENDING TO BE LEGALLY BOUND, and in consideration of the mutual agreements stated herein, the Company and the Employee hereby agree as follows."

The parties battled to a compromise acceptable to both of them. The deal is supported by consideration.

Did McCloskey violate the restrictive covenants?

Innovest Systems was one of five companies specifically named in the noncompetition clause contained in the Amendment to the 2011 Sales Compensation Plan. McCloskey went to work for Administrative Systems, Inc., unaware that there were some discussions underway between his new employer and Innovest concerning acquisition. That acquisition was announced in April 2013. By continuing to work for Administrative Systems, LLC post-merger, SunGard argues that in practical effect McCloskey is rendering "material service" to Innovest on and after April 30, 2013. McCloskey testified and argues that he did nothing wrongful, that he had no control, input or even knowledge about the merger, and that it would

be harsh to now require him to quit his employment with Administrative Systems, LLC. He urges the court not to interpret the "affiliates and successors" language to that end, but to apply it prospectively; when McCloskey accepted employment, he had breached nothing.

McCloskey and his new employer were aware of the noncompetition clause and took precautions so as not to violate it. McCloskey testified he understood this provision applied only to competing with the sales business he did at SunGard, that is selling Global Plus. Since ASI does not compete with Global Plus, and since he only engaged in sales activities for 5% of his time, he reasoned his new employment did not constitute a violation of this covenant. His activities for ASI and its member, Bluff Point, were in identifying potential mergers and acquisitions. McCloskey did no mergers and acquisitions work of any kind while at SunGard. He stepped away from Innovest meetings when sales discussions were to occur.

The court cannot read the literal language agreed to by McCloskey within the noncompetition clause any other way: he agreed that he would not perform "any material services" for "Innovest Systems" or its "affiliates or successors". The court declines to read in the suggested prospective term urged upon it. The court concludes that ASI, LLC is an affiliate of Innovest Systems and that McCloskey is performing material services for it.

McCloskey is regarded by the court as being in breach of the noncompetition covenant as written. But because the covenant is overbroad, the court intends to modify it.

As to the nonsolicitation provision, another type of restrictive covenant, the evidence at the hearing was that McCloskey did not contact any of his former customers.

Nor did the evidence preponderate for the proposition that McCloskey knowingly contacted any customer, prospective customer, or affiliate of a customer with the purpose or effect of competing or interfering with any of SunGard's business. He is not using any of the knowledge he acquired at SunGard in order to perform his functions with his new employer. He does not have to rely on trade secrets of SunGard in order to do his job, and the reverse was true. David Battrich, formerly an ASI sales employee, became reemployed by SunGard. It was conceded by SunGard that Battrich did not need to contact his former customers or utilize any secret data of ASI in order to do his job at SunGard.

The court does not discern that McCloskey is in violation of the nonsolicitation clause.

Protectable Business Interests

Pennsylvania law "permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer's protectable business interests." *Hess*, 570 Pa. at 162, 808 A.2d at 920 (citation omitted). Hence, "[t]he presence of a legitimate, protectable business interest of the employer is a threshold requirement for an enforceable noncompetition covenant." *Wellspan Health*, 869 A.2d at 997. Generally, legitimate business interests that can be protected through restrictive covenants include trade secrets or confidential proprietary information, customer goodwill, and unique or extraordinary skills developed through specialized training. *Hess*, 570 Pa. at 163, 808 A.2d at 920; *Wellspan Health*, 869 A.2d at 996-97. Customer goodwill is considered a protectable interest even when the goodwill has been acquired through the efforts of the employee. *Sidco Paper Co.*, 465 Pa. at 591, 351 A.2d at 252-53.

The evidence at the hearing demonstrated that SunGard took appropriate steps to safeguard its legitimate interests. On the other hand, much of what a good salesperson like McCloskey and the others need is either in the public domain or readily available. This includes the names and addresses of the top tier buyers of their services, the names and contact information of the departmental personnel who purchase various systems (albeit over a one (1) to three (3) year process), and the price the salesperson has to beat in order to sell a competing system. As mentioned, SunGard's witnesses conceded this. Accordingly, such information is not protectable as a trade secret in the first instance.

Balancing of Competing Interests

In those instances where a noncompetition agreement imposes restrictions that are deemed to be broader than necessary to protect the former employer's interests, the Supreme Court has "repeatedly held that a court of equity may grant enforcement limited to those portions of the restrictions that are reasonably necessary for the protection of the employer." *Hess*, 570 Pa. at 162-63, 808 A.2d at 920; *see also Sidco Paper Co.*, 465 Pa. at 595, 351 A.2d 254, *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) ("To be reasonably necessary for the protection of the employer, a covenant must be tailored to protect legitimate interests."). In making that determination, the reviewing court must balance "the employer's protectable business interests against the interest of the employee in earning a living in his or her chosen profession, trade or occupation," and thereafter balance those competing interests "against the interest of the public." *Hess*, 570 Pa. at 164, 808 A.2d at 920; *J. C. Ehrlich Co.*, 979 A.2d at 864-65. Thus, post-employment restrictive covenants

are subject to a more stringent test of reasonableness than covenants not to compete which are ancillary to the sale of a business. *See Hess, supra*; *Thermo-Guard, Inc. v. Cochran*, 408 Pa. Super. 54, 65, 596 A.2d 188, 194 (1991); *Citadel Broad.*, 52 Pa. D. & C.4th at 545. The court must make a "searching inquiry" of all the circumstances surrounding enforcement of these kinds of covenants to determine its reasonableness. *Insulation Corp. of Am. v. Brobston*, 446 Pa. Super. 520, 667 A.2d 729, 735 (1995). Thus, reasonableness must be determined on a case-by-case basis. *Id.* at 735, n. 7. The determination of reasonableness is a factual one with the party claiming unreasonableness as a defense against enforcement of the covenant bearing the burden of proof. *Wellspan Health*, 869 A.2d at 999.

The Blue Pencil

A consequence of its "broad powers to modify the restrictions imposed on the former employee to include only those restrictions reasonably necessary to protect the employer," *All-Pak, Inc.*, 694 A.2d at 350-51, is that the court may reform or "blue pencil" the covenant by removing offensive portions or supplying new, limiting language and thereafter enforcing the covenant as reformed. *See Wellspan Health*, 869 A.2d at 996, n.2 (Pa. Super. 2005), *Thermo-Guard Inc.*, 408 Pa. Super. at 65 n.9, 596 A.2d at 194 n.9 (1991); *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412 (2010); *Hillard v. Medtronic, Inc.*, 910 F. Supp. 173, 177 (M.D. Pa. 1995).

Taking all of these principles into account, in this case the court concludes that the noncompetition covenant in the amendment to the 2011 Sales Compensation amounts to overreaching on SunGard's part in its efforts to protect its interests. It is true that the covenant appears

to be limited insofar as it singles out five companies to which McCloskey was not to provide material services. It is also true that McCloskey had a hand in drafting it; most employees do not. In either event, it remains the responsibility of the court to scrutinize the effect of the covenant as applied to the facts and, if need be to achieve a proper balance, further shape its terms. And, in actuality, since there are so few potential employers to whom McCloskey could turn, the effect of this clause is much more drastic than would initially appear.

The court credits McCloskey for finding employment doing a very different kind of activity, mergers and acquisitions, from the work he performed for so many years for SunGard and the predecessor company it acquired, Premier Systems, Inc. Many former employees, because of their specialized training and knowledge, do not have that capability.

McCloskey does not engage with any of his former contacts. He absents himself from sales meetings. He uses no trade secret information of SunGard's. And yet, SunGard asserts that he nonetheless be precluded from earning a living this way.

This covenant is overbroad.

McCloskey is not in fact competing under the foregoing analysis in any way that is SunGard's legitimate concern. SunGard's desire to impose what really amounts to a virtual ban of McCloskey from the relevant marketplace is not legitimate.

In order to ensure enforcement of only those restrictions which are reasonably necessary for the protection of SunGard Business Systems, LLC's valid business interests, McCloskey's noncompetition agreement will be reformed

so as to permit McCloskey's employment with ASI, LLC, notwithstanding any derivative benefit that might accrue to Innovest Systems. *See Wellspan Health*, 869 A.2d at 1002 (finding noncompetition covenant reasonable as to York and Adams counties, but unreasonable with respect to Lancaster County); *Thermo-Guard, Inc.*, 408 Pa. Super. at 65, 596 A.2d at 194 (to protect former employer's interest in customer goodwill developed by former employees, limited injunction was issued prohibiting employees "from contacting or developing any relationship with any of Thermo-Guard's present customers or prospective customers who became known to [the employees] through their employment with Thermo-Guard."); *Zambelli Fireworks*, 2009 W.L. 159182, at *16 (employee enjoined only "from contacting or developing any business relationship with any of Zambelli's present or prospective customers who had contact with or became known to [employee] through his employment with Zambelli for the two-year restrictive time period."); *Hillard*, 910 F. Supp. at 176 (former employee "is not prohibited from competing 'in any manner' with Medtronic, he is restricted only from involvement with certain products on which he worked within the prior two-year period when he was employed by Medtronic."). The court's modified prohibition adequately protects SunGard's legitimate interest in customer goodwill while simultaneously respecting McCloskey's right to earn a living in his chosen field.

If the nonsolicitation covenant should be in conflict with this modification of the noncompetition covenant, the latter shall govern.

As to the other individuals, the Corbel Employment Agreement signed by Charleton Moore is unenforceable for two reasons. First, under Florida law, a noncompetition

agreement may only be assumed by a subsequent employer if the agreement expressly authorizes its assignment or assumption, and the Corbel Employment Agreement has no such provision. Fl. St. §542.33 provides that a non-compete can only be assigned when the employee consents to the assignment. *See DePuy Orthopaedics, Inc. v. Waxman*, 95 So. 3d. 928, 935 (1st DCA Fl. 2012) (explaining that §542.33, which was repealed in 1996 and superseded by Fl. St. §542.335, remains in force for restrictive covenants entered into before July 1, 1996). Second, even if enforceable, Moore has never engaged in any of the activities set forth in the "Description of Corbel & Co. Business Activities" while employed at SunGard. Case law in Pennsylvania is to same effect. *See All-Pak, Inc.*, 694 A.2d at 351 (restrictive covenants contained in employment contracts are unassignable absent the consent of the employee). Consequently, SunGard is not entitled to injunctive relief for any alleged violation of the Option Agreement.

The court is not persuaded that Wyatt was in violation of her employment agreement. There is no evidence that Wyatt has violated the broad language of the restrictive provisions. She is working in an entirely different "market" than the "market" she served at SunGard and therefore her non-competing employment at ASI is expressly not a violation of her SunGard employment agreement.

SunGard did not show that McCuen has its confidential materials. As with the others, SunGard lost no customers, and does not believe itself in danger of doing so, as a result of any of McCuen's efforts. No injunction will enter therefor.

That brings us to a discussion of the practice of "cross-selling" by SunGard's salespersons. McCloskey,

for example, only sold SunGard's Global Plus product. If he came across an opportunity to market SunGard's Reliance product to a customer, he was encouraged, if not required, to cross-sell by passing the information back to the Reliance group for follow-up. That is all the referring salesperson did, however. Moore, Wyatt and McCuen did the same thing.

SunGard tried to make the case that because McCloskey could cross-sell in this fashion, he had essentially marketed all of SunGard's major products. If accepted by the court, this would further broaden the reach of restrictive covenants. From the evidence it seemed to the court, however, that these opportunities were infrequent and the results were negligible.

## D. STANDARD OF REVIEW FOR PRELIMINARY INJUNCTIONS

To establish its right to the issuance of a preliminary injunction, SunGard must demonstrate six factors, namely that: (1) an injunction is necessary to prevent immediate and irreparable harm which cannot be adequately compensated by damages; (2) greater injury would result from refusing an injunction than from granting it; (3) an injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) its right to relief is clear, *i.e.*, SunGard is likely to prevail on the merits; (5) the injunction sought is reasonably suited to abate the offending activity; and (6) a preliminary injunction will not adversely affect the public interest. *Pennsylvania Gaming Control Bd. v. City Council of Philadelphia*, 593 Pa. 241, 277-78, 928 A.2d 1255, 1277 (2007); *Pennsylvania State Ed. Assoc. v. Commonwealth, Office of Open Records*, 981 A.2d 383, 385 (Pa. Commw. 2009).

Imminence of Harm

Since the harm resulting from the violation of a noncompetition agreement is difficult to quantify, "[t]he great weight of modern authority" holds that a party "who has been or will be injured" by the breach of a restrictive covenant "is ordinarily entitled to the equitable remedy of injunction...." *Records Ctr., Inc.*, 363 Pa. Super. at 86, 525 A.2d at 436 (citation omitted). As the Supreme Court of Pennsylvania has observed, "[i]t is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention." *John G. Bryant Co., Inc. v. Sling Testing and Repair, Inc.*, 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977). Thus, "Pennsylvania courts have uniformly recognized that a violation of a noncompetition agreement results in harm which is not compensable by money damages." *Zambelli Fireworks*, 2090 W.L. 159182, at *16.

All six of these factors must have been proven at the hearing for the preliminary injunction. In the court's estimation, what is clearly missing is the imminence of harm. SunGard's witnesses could not identify that any harm had actually occurred. They explained that their sales cycles could be one to two or even more years in length and, consequently, they might not know of any harm until sometime *in futuro*. That may well be, but the requirements of the law are unflinching. The harm must not only be irreparable but it must be immediate.

The court is satisfied that SunGard reacted in a sufficiently timely way in filing its action. It does not agree with the defendants' characterizations that SunGard was

dilatory in getting to the courthouse. But the immediacy of injury must be demonstrated. The reason it is required is because a preliminary injunction is issued early in a proceeding and limited to occasions when the threatened harm would impair the court's ability to grant an effective remedy.

A preliminary injunction will not be issued merely to allay the apprehensions or to soothe the anxieties of the parties; more than a concern of a risk of future harm must be demonstrated. As the Third Circuit Court of Appeals well put it, "an injunction may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law." *Continental Group, Inc. Amoco Chem. Corp.*, 614 F.2d 351, 358-59 (3d. Cir. 1980).

For these reasons, an appropriate order follows.

## ORDER

And now, this 1st day of November, 2013, upon consideration of the motion of plaintiff SunGard Business Systems, LLC for a preliminary injunction, the responses thereto and the parties' memoranda of law, and after a hearing held on the motion on October 15-16, 2013, the preliminary injunction is denied; the court's earlier order entered August 5, 2013 is vacated, and any injunctive relief therein is dissolved; the noncompetition covenant in the amendment to the 2011 Sales Compensation Plan of defendant McCloskey is modified so as to permit McCloskey to engage in the mergers and acquisitions work he has been doing for Administrative Systems, LLC, including up to 5% in sales activities; the nonsolicitation covenant in the same plan shall not be interpreted to the contrary;

It is further ordered that the security previously posted by the plaintiff with the prothonotary of Chester County in the amount of $1.00 on August 2, 2013 may be returned to the plaintiff, less poundage if any.