J-A29037-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| THOMAS WILER AND MICHAEL KOHLER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| THOMAS M. MAGGIO | : | |
| | : | |
| APPEAL OF: THOMAS WILER | : | No. 452 WDA 2016 |

Appeal from the Judgment entered March 14, 2016
in the Court of Common Pleas of Erie County,
Civil Division, No(s): 12230-2012

BEFORE: DUBOW, MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED FEBRUARY 13, 2017**

Thomas Wiler ("Wiler") appeals from the Judgment entered following the trial court's verdict in favor of Thomas M. Maggio ("Maggio") and against Wiler.[1]  We affirm.

In its Opinion, the trial court summarized the factual history underlying the instant appeal as follows:

> [Wiler] is the sole owner of 614 Cherry Street, Erie, Pennsylvania[,] by [a] deed dated December 10, 2005.  This property is adjacent to the real property known as 620 Cherry Street, Erie, Pennsylvania, owned by [Maggio] by [a] deed dated January 30, 2008[,] and recorded on February 5, 2008 ("the Maggio Deed").
>
> These two properties are located in the historic Garden Court area of the City of Erie and governed, in part, by a Declaration of Trust of J.W. Little to Edward J. Crowell, *et al.*[,] recorded on June 22, 1907 (the "Declaration").

---

[1] Wiler's co-plaintiff, Michael Kohler, was withdrawn as a plaintiff for lack of standing.  Trial Court Opinion, 5/24/16, at 1 n.1.

The Declaration has a total of eight restrictions serving as covenants running with the land of each lot within the Garden Court. The first three restrictions limit each lot to only one single family building with minimum cost and setback requirements. The fourth restriction states that "[n]o barns, automobile houses or sheds, or other out buildings[,] shall be placed or erected …." Further, "[n]o building placed or erected on the said described premises shall at any time be used for commercial purposes." The question in this case is whether these restrictions, which have never been abrogated and remain generally valid, are nonetheless unenforceable against [Maggio].

[Maggio's] Property is the only one on the Garden Court with two buildings suitable for residential living. These two buildings have been in existence likely since 1913. The main house on [Maggio's] property has always been identified as 620 Cherry Street and is over 2000 square feet. The second building, which is approximately 675 square feet, sits on the rear of [Maggio's] property. It has been identified as 620½ Cherry Street from at least 1930 until [Maggio] had the address changed to 622 Cherry Street in 2012. [Wiler] contends that [Maggio] cannot use [622] for commercial purposes by renting it as an apartment to non-members of the Garden Court.

Trial Court Opinion, 5/24/16, at 1-2 (citations omitted).

In June, 2012, Wiler filed a Complaint seeking an order from the trial court "enjoining [Maggio] from using the garage on the premises at [622] Cherry Street ... as a separate residence." Complaint, 6/20/12, at 4 (unnumbered). Maggio filed an Answer and New Matter raising the affirmative defenses of laches, estoppel, and the statute of limitations. Answer and New Matter, 8/31/12, at 5. Following a trial, the trial court entered a verdict in favor of Maggio and against Wiler. The trial court ultimately determined the following:

[T]he Garden Court deed restrictions do not prevent a member from renting a single family dwelling. If renting is a violation of

- 2 -

the deed restrictions, [Wiler] is committing the same violation as [Maggio]. Further, the doctrine of laches prevents [Wiler] from objecting to [Maggio's] use of his building. As a matter of equity, [Wiler] has not set forth a basis to receive the extraordinary remedy of a permanent injunction.

Trial Court Opinion, 5/24/16, at 1; *see also id.* at 4 n.3 (stating that by placing a fence on his property, Wiler was in violation of the Declaration; therefore, Wiler lacked "clean hands" in bringing this action); 4-19 (concluding that the doctrine of laches applies to bar Wiler's claim).

Wiler filed post-trial Motions, which the trial court denied. After entry of Judgment on the verdict, Wiler filed the instant timely appeal, followed by a Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Wiler now presents the following claims for our review:

I. Did the [t]rial [c]ourt commit an error of law when it failed to grant [Wiler] a permanent injunction enforcing the restrictive covenant contained in the Declaration []?

II. Did the [t]rial [c]ourt commit further error when it found in favor of [Maggio] based on the affirmative defense of the [d]octrine of [l]aches?

Brief for Appellant at 7. We will address Wiler's claims together, as they are related.

Wiler claims that the trial court erred when it concluded that the doctrine of laches barred Wiler from enforcing the Declaration. *Id.* at 11. Wiler contends that there is no evidence that he failed to exercise due diligence in initiating the instant action. *Id.* at 12, 20. Wiler argues that when he found out that Maggio intended to rent the building to family

- 3 -

members, he immediately initiated this action. *Id.* at 12. Further, Wiler argues that Maggio presented no evidence that he was prejudiced by any lack of due diligence. *Id.*

Wiler also argues that the trial court misstated his position. *Id.* at 12-13. Wiler explains that he does not oppose the rental of Maggio's home, but the rental of the second building on the property. *Id.* Wiler emphasizes that two units exist on a single lot, and that the restrictions in the Declaration apply to the second building. *See id.* at 13.

Wiler asserts that Maggio's arm's length rental of the second unit to third parties is for a "commercial purpose," and therefore barred by the restrictive covenant in the Declaration. *Id.* at 16. Wiler further contends that Maggio should not "inherit the historical use of the property by [his] predecessors in title." *Id.* at 17 (some capitalization omitted). Although Wiler acknowledges that there is no evidence of an action or objection related to a predecessor's prior use of the second building, he argues that there was no formal action ever undertaken by the Garden Court membership or its board. *Id.* at 18. Therefore, Wiler argues, the restrictive covenant runs with the land. *Id.*

Wiler additionally argues that that the evidence does not support the trial court's determination as to the prior use of the second building. *Id.* at 20. Wiler maintains that "[t]he inclusion of a bathroom, refrigerator and gas and water services hardly suggests that the building will automatically

bec[o]me a permanent rental unit." *Id.* at 20-21. According to Wiler, Maggio's witnesses "generally supported [Wiler's] position that the covenants are valid and enforceable[,] and that no one had ever granted permission to [Maggio] to rent the second unit out." *Id.* Wiler also directs our attention to evidence that Maggio did not pay taxes on the second unit on the property. *Id.* at 21. Wiler points to evidence of his due diligence, claims that no prejudice would result to Maggio, and argues that a permanent injunction is warranted. *See id.* at 20-25.

"To prevail in a claim for a permanent injunction, the plaintiff must prove a 'clear right to relief.'" *Wellspan Health v. Bayliss*, 869 A.2d 990, 995 (Pa. Super. 2005) (citation omitted). Our standard of review on appeal in cases involving permanent injunctions is limited to whether the court committed an error of law in denying the injunction. *Buffalo Twp. v. Jones*, 813 A.2d 659, 664 n. 4 (Pa. 2002). Moreover, we are cognizant that, in cases tried without a jury, our review is

> limited to a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

*Anderson v. Litke Family Ltd. P'ship*, 748 A.2d 737, 739 (Pa. Super. 2002).

"As a general matter, restrictive covenants on the use of land interfere with an owner's free use and enjoyment of real property and, therefore, are not favored by the law." *Vernon Twp. Volunteer Fire Dep't, Inc. v. Connor*, 855 A.2d 873, 879 (Pa. 2004). "Although the law may disfavor restrictions on an owner's free use and enjoyment of real property, restrictive covenants are legally enforceable." *Id.* "[C]ovenants restricting the use of land are construed most strictly against one claiming their benefit and in favor of the free and unrestricted use of property." *Dreherb Twp. Bd. v. Solitron Dev. Co.*, 481 A.2d 1207, 1211 (Pa. Super. 1984).

As our Supreme Court has explained,

> [a] landowner may limit his or her private use and enjoyment of real property by contract or agreement. It is a fundamental rule of contract interpretation that the intention of the parties at the time of contract governs and that such intent must be ascertained from the entire instrument. This same principle of contract law is equally applicable to the interpretation of restrictive covenants.

*Vernon Twp. Volunteer Fire Dep't, Inc.*, 855 A.2d at 879. In order to ascertain the intentions of the parties, restrictive covenants must be construed in light of (1) their language; (2) the nature of their subject matter; (3) the apparent object or purpose of the parties; and (4) the circumstances or conditions surrounding their execution. *Id.*

In its Opinion, the trial court addressed Wiler's claims and concluded that they lack merit.  **See** Trial Court Opinion, 5/24/15, at 3-23.  We agree with the reasoning of the trial court, as set forth in its Opinion, and affirm on this basis.  **See id.**

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/13/2017

THOMAS WILER    COMMON PLEAS COURT    :   IN THE COURT OF COMMON PLEAS

Plaintiff    ERIE, PA

     2016 MAY 24   AM 10: 40:     :   OF ERIE COUNTY, PENNSYLVANIA

v.    CLERK OF RECORDS

THOMAS M. MAGGIO    PROTHONOTARY   :   CIVIL DIVISION

Defendant                    :   NO. 12230 -2012

## OPINION

This lawsuit represents the Plaintiff's attempt to enjoin a neighbor from renting a single family dwelling in alleged violation of their respective deed restrictions.

A bench trial resulted in a verdict in favor of the Defendant on January 11, 2016 denying the Plaintiff's request for an injunction. After the Plaintiff's Motion for Post Trial Relief was denied, this timely appeal followed. A Statement of Matters Complained of on Appeal was filed April 12, 2016; this Opinion is in response thereto.

In summary, the Garden Court deed restrictions do not prevent a member from renting a single family dwelling. If renting is a violation of the deed restrictions, the Plaintiff is committing the same violation as the Defendant. Further, the doctrine of laches prevents the Plaintiff from objecting to the Defendant's use of his building. As a matter of equity, the Plaintiff has not set forth a basis to receive the extraordinary remedy of a permanent injunction.

## BACKGROUND

The Plaintiff Thomas Wiler is the sole owner of 614 Cherry Street, Erie, Pennsylvania by deed dated December 10, 2005.[1] *Plaintiffs' Exhibit 26.* This property is adjacent to the real property known as 620 Cherry Street, Erie Pennsylvania, owned by the Defendant by deed dated January 30, 2008 and recorded on February 5, 2008. *Plaintiffs' Exhibit 1.*

---

[1] At the time of trial, Michael Kohler was withdrawn as a Plaintiff for lack of standing since he has never had an ownership interest in co-Plaintiff Thomas Wiler's property that is the subject of this lawsuit.

Appendix "A"

These two properties are located in the historic Garden Court area of the City of Erie and governed, in part, by a Declaration of Trust of J.W. Little to Edward J. Crowell, et al. recorded on June 22, 1907 (the "Declaration"). *Plaintiffs' Exhibit 4.*

The Declaration has a total of eight restrictions serving as covenants running with the land of each lot within the Garden Court. The first three restrictions limit each lot to only one single family building with minimum cost and setback requirements. *Id., Restrictions 1-3.* The fourth restriction states that "(n)o barns, automobile houses or sheds, or other out buildings shall be placed or erected ..." *Id., Restriction 4.* Further, "[n]o building placed or erected on the said described premises shall at any time be used for commercial purposes." *Id., Restriction 5.* The question in this case is whether these restrictions, which have never been abrogated and remain generally valid, are nonetheless unenforceable against the Defendant.

The Defendant's property is the only one in the Garden Court with two buildings suitable for residential living. These two buildings have been in existence likely since 1913. The main house on the Defendant's property has always been identified as 620 Cherry Street and is over 2000 square feet. The second building, which is approximately 675 square feet, sits on the rear of the Defendant's property. It has been identified as 620 ½ Cherry Street from at least 1930 until the Defendant had the address changed to 622 Cherry Street in 2012. It is the smaller building, identified as 620 ½ Cherry, which is the subject of this lawsuit.

The Plaintiff claims the Defendant converted 620 ½ Cherry from a garage to a rental apartment sometime between 2008 and 2011. The Plaintiff contends the Defendant cannot use 620 ½ Cherry for commercial purposes by renting it as an apartment to non-members of the Garden Court.

At trial the Defendant did not contest the validity of the deed restrictions. The Defendant denied converting 620 ½ Cherry from a garage and presented a long history of the open, residential use of it by many different tenants. The governing body of the Garden Court, known as the Civic Art Realty Company, knew of the deed violations at 620 ½ Cherry likely since 1913 yet never instituted any legal action to enforce the deed restrictions.

The Plaintiff was aware of these deed violations prior to buying 614 Cherry in 2005 and never took action until filing this lawsuit in 2012. The Defendant would not have bought this property if he could not use the smaller building as a rental and he spent considerable sums on this building since the time of his purchase.

## I.     THE PLAINTIFF CANNOT PREVENT THE DEFENDANT'S RENTAL

The Plaintiff selectively contorts the restrictions within the Declaration to read that he can rent his home but his neighbor cannot rent a longstanding residential building behind his home. There is no support for the Plaintiff's position from a plain reading of the restrictions and as a matter of equity.

There is no language in any of the Declaration's eight restrictions using the words rent or rental or prohibiting the rental of a building. Likewise, there is no definition of "commercial purposes" in Restriction 5 or anywhere in the Declaration.

As a result, the Plaintiff maintains the rental of his home, which he has done for years, is not in violation of any restriction. *Trial Transcript October 7, 2015 (hereafter "T.T".) pp. 60-61.*[2] To accept the Plaintiff's testimony and interpretation inherently means renting a home is not a commercial activity proscribed by Restriction 5 or anywhere in the Declaration. If renting

---

[2] *See also* Plaintiff's Proposed Findings of Fact, Paragraph 18 ("There are no restrictions in the Declaration of Trust concerning the renting out of the property.").

is not a commercial endeavor, then the Plaintiff cannot seek equitable relief to preclude the Defendant from renting since the Defendant is not violating any restriction.

If renting is a commercial activity prohibited by Restriction 5, it is applicable to the only type of building permitted under the Declaration, to-wit, a single-family home. As such, Restriction 5 applies to all homes, including the Plaintiff's.

Since the recording of the Declaration in 1907, no enforcement action has ever been taken by the governing body or any association member of the Garden Court to prevent another association member from renting a home in the Garden Court because such a rental constituted commercial activity. For years members have rented homes within the Garden Court—including the Plaintiff.

As a matter of equity, the Plaintiff cannot prevent the Defendant from renting a building just as the Plaintiff has been doing for years. The Plaintiff does not have a viable claim in equity.[3]

The analysis of this case need go no further since the equitable relief the Plaintiff seeks is to enjoin the Defendant from renting his rear building. However, to the extent the use of the Defendant's building as a rental unit remains in dispute, laches bars any further argument.

## II. THE DOCTRINE OF LACHES APPLIES

"The doctrine of laches is an equitable bar to the prosecution of stale claims and is the practical application of the maxim that those who sleep on their rights must awaken to the consequence that they have disappeared." *Fulton v. Fulton*, 106 A.3d 127, 131 (Pa. Super. 2014), quoting *Jackson v. Thomson*, 53 A. 506, 506 (Pa. 1902).

The doctrine of laches bears these requirements:

---

[3] Separately, the Plaintiff is in violation of Restriction 6 of the Declaration since 2011 when he put up a fence. This violation is yet another reason he does not have clean hands in making this claim in equity.

Laches bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute the action to the prejudice of another. Thus, in order to prevail on an assertion of laches, respondents must establish: a) a delay arising from petitioner's failure to exercise due diligence; and, b) prejudice to the respondents resulting from the delay. Moreover, the question of laches is factual and is determined by examining the circumstances of each case.

*Fulton*, 106 A.3d at 132, *quoting Estate of Scharlach*, 809 A.2d 382, 383 (Pa. Super. 2002).

The doctrine of laches is not subject to a statute of limitations; indeed, laches may bar a suit in equity when a legal claim involving the same matter is still within a statute of limitations. *Fulton, supra.*

In this case, the smaller building on the Defendant's property was likely built in 1913 and used as a medical office. Since the early 1920s it has been used as a residential apartment for non-members of the Garden Court.

Since its construction 620 ½ Cherry has been in violation of Restrictions 2, 3 and 4 of the Declaration which together permit only one single-family building per lot. Despite knowledge of these violations since the construction of the second building, no legal action was ever filed by the governing body or any member of the Garden Court until the Plaintiff filed this lawsuit in 2012.

The Plaintiff was aware of these violations prior to his purchase of 614 Cherry in 2005 and waited over 6 ½ years to seek to enforce the restrictions despite his knowledge of the time and expense incurred by the Defendant to give his rear building a facelift.

Hence, there is nearly a century's worth of delay in enforcing the deed restrictions. To enforce the deed restrictions now would cause substantial prejudice to the Defendant. Each prong of laches is satisfied in this case.

## A. The Historical Use of 622 Cherry Street

As noted, the Declaration of Trust creating the deed restrictions for the Garden Court was formally recorded in 1907. From 1910 until the time of the Defendant's purchase in 2008, there were only two predecessors in title for 620 Cherry. For those 98 years, each of these two prior owners openly used 620 ½ Cherry as an apartment, albeit sporadically at times.

Carl and Emma Kirshner, husband and wife, bought 620 Cherry by deed dated August 23, 1910 and recorded August 25, 1910. *Plaintiff's Exhibit 3.* Carl Kirshner used the building now known as 620 ½ Cherry as a medical office. *Defendant's Exhibit 8.* It is unclear when this use began, but it ended when Dr. Kirshner died on April 20, 1920. His widow then held title to this property until 1961.

After her husband's death, Emma Kirshner converted 620 ½ Cherry to an apartment suitable for residential living. This conversion had to be before 1930.

At some point Mrs. Kirshner's daughter and son-in-law lived in the converted apartment. Thereafter the public records show various other people living there when it was known as 620 ½ Cherry, an address recognized by the US Census Bureau in 1930.

The U.S. Census for 1930 showed a Charles and Myrtle Stanbaugh paid rent to live at 620 ½ Cherry. It is unknown whether this couple is the daughter and son-in-law of Mrs. Kirshner.

Thereafter, the City of Erie Directory shows a Mrs. Mod Thompson lived at 620 ½ Cherry in 1934. *Defendant's Exhibit 26.* Likewise, the City of Erie Directory shows a Mrs. Mod Thompson lived at 620 ½ Cherry in 1943. *Defendant's Exhibit 27.*

The same Directory shows a Raymond G. Kern living at 620 ½ Cherry in 1953. *Defendant's Exhibit 28.* The City of Erie telephone book for 1955 lists a phone number for Raymond J. Kern at 620 ½ Cherry. *Defendant's Exhibit 29.*

The 1957 City Directory shows a Mrs. Jean Kern lived at 620 ½ Cherry. *Defendant's Exhibit 30.* She was possibly a spouse or family member of Raymond Kern. The City Directory shows a Gladys Wilkinson living at 620 ½ Cherry in 1959 and 1960. *Defendant's Exhibits 31, 32.*

In 1961 Mrs. Emma Kirshner conveyed a deed for 620 Cherry and 620 ½ Cherry to John and Micaela Bowler. *Plaintiff's Exhibit 2.*

In the latter years of Mrs. Kirshner's ownership, the Civic Art Realty Company did raise a concern to her about the residential use of 620 ½ Cherry. The following entry appears in the minutes of a March 19, 1957 Civic Art Realty Company meeting under "New Business":

> "Garage Apartment at 620 Cherry St. – It was learned that Mrs. Kirschner is planning to rent the garage apartment which had originally been established for her husband's office and later for her daughter and son-in-law. It is felt that renting this apartment to outsiders would become a precedent for the establishment of two-family homes or apartments on the Court. Mr. Lovercheck will see the owner personally within a few days to express the Court's feeling on this matter and to attempt to have her plans changed. It this is not successful, Messrs. McClure and Quinn will draft a letter to the owner to go on record as a preliminary step to further action."
> *Plaintiffs' Exhibit 10.*

The diplomatic approach of Mr. Lovercheck was unsuccessful. One week later, the minutes of the March 26, 1957 meeting of the Civic Art Realty Company reflect an entry under "Old Business" as follows:

> "Garage apartment at 620 Cherry St. – Mr. Lovercheck reported the results of his visit with Mrs. Kirschner on March 24. The latter said she would be cooperative by being careful who rents the apartment, and that she would allow no one with children because of the insufficient room; at the same time, she was positive in her determination to keep the apartment. She expressed the opinion that the Court

should have complained several years earlier; she said also that she wasn't the first person to rent such an apartment, but did not say who was the first. Insofar as we know, of, course, no rent had previously been collected for the apartment, which was originally established as an office for Dr. Kirschner and subsequently used by Mrs. Kirschner's daughter and her husband as an apartment. We believe that, for the reason that the garage dwelling had up to this time been used by members of the owner's family, no action had been taken in the past."

*Defendant's Exhibit 19.*

These minutes clearly reflect the knowledge of the Civic Art Realty Company in 1957 there were two single- family dwellings on one lot in violation of Restrictions 2 and 4. The minutes also reflect the Board's failed attempt through its envoy Mr. Loverchek to get Mrs. Kirschner to cease using the rear building as an additional dwelling/apartment.

The Civic Art Realty Company then chose to report Mrs. Kirshner to the City of Erie building inspector for an alleged zoning violation. By letter dated April 1, 1957 on company letterhead, Mr. J. G. Ward, in his capacity as Secretary-Treasurer of the Civic Art Realty Co., requested an investigation into the rental by Mrs. Kirschner of both buildings at 620 Cherry, identifying one rental as "a second dwelling (garage apartment) at the rear of the lot is or will be rented by Mrs. Kirshner to a new tenant." *Defendant's Exhibit 15.* This is no evidence the City of Erie conducted the requested investigation. What is known is the City of Erie never instituted an enforcement action against Mrs. Kirshner for an alleged zoning violation.

Despite the knowledge and belief of members of the Civic Art Realty Company that Mrs. Kirshner's use of 620 ½ Cherry was in violation of the deed restrictions, the Board never took any legal action of any type to enforce the deed restrictions during the 41 years that she owned the property.[4] The failure of the Board to file any enforcement action against Mrs. Kirshner

---

[4] It is interesting to note the reference by Mrs. Kirshner to Mr. Lovercheck in their March 24, 1957 meeting that she was not the first owner to rent an apartment in the Garden Court which perhaps explains the unwillingness of the Board to take action. Another possible explanation is the recognition, as the Plaintiff endorses in this case, that renting a home is not prohibited by the terms of the Declaration.

means the Board acquiesced to her use of 620 ½ Cherry Street and "slept on its rights" making laches applicable.

The same failure of the Civic Art Realty Company to file any enforcement action occurred during the nearly 47 years the Bowlers owned 620 and 620 ½ Cherry. According to Mrs. Bowler, various people lived in the rear building throughout the years. *Plaintiffs' Exhibit 34, p. 26.* Clara Storch was a tenant living in the building for 5 to 6 years and Mrs. Bowler's sister-in-law also lived there for a time. *Plaintiffs' Exhibit 34, p. 11-12.* She also let family members stay at 620 ½ Cherry. Her neighbor of twenty-four years, Gerald Urbaniak, recalled the Bowlers' daughters staying in what his daughter affectionately called the Little House. *T.T. p. 182.*

Mr. Bowler was an attorney. According to Mr. Urbaniak, at times he thought Mr. Bowler was using the rear building as an office. *T.T. p. 183.* Mr. Urbaniak observed mail being delivered there by the mailman. *Id.* If so, such use was arguably commercial in violation of Restriction 5. Yet at no time did the Civic Art Realty Company ever file any enforcement action against the Bowlers.

The use of 620 ½ Cherry again surfaced in 1974 when the City of Erie was contemplating a zoning change affecting the Garden Court. Most of the Garden Court residents were in favor of the proposed rezoning. John Bowler was not in favor of it.

The minutes of a Civic Art Realty Company meeting on October 20, 1974 state:

> "A petition in support of the rezoning had been circulated in the Court and all but three members of the Court signed the petition. John Bowler did not sign because he has two dwellings on his property, and he felt that the Rezoning would limit the possible use of the second dwelling. He would like a clarification of this before he would sign the petition."
> *Defendant's Exhibit 16, page 2.*

Thereafter, Attorney Bowler authored a letter dated February 11, 1975 to John Horan, Director of Community Development and City Planning for the City of Erie, in which he outlined his concerns for the rezoning of 620 and 620 ½ Cherry. *Defendant's Exhibit 17*. Attorney Bowler was very open that "our premises had erected thereon two single-family dwellings" and he wanted assurances that the rezoning "was not intended to adversely affect our rights in any way." *Id*. He wanted to ensure that the new zoning "will not be construed to restrict the unqualified right of my wife and me and our successors in title to use the premises for two single family dwellings and that such rights shall not be lost by periodic vacancy (no matter how long continued) in view of the permanent nature of the design for use as separate dwellings." *Id*.

There is no documented evidence of a response from any City of Erie official to Attorney Bowler's letter. However, there was a response from the Civic Art Realty Company.

In an effort to assuage Attorney Bowler's concerns, the Civic Art Realty Company sent a letter dated September 15, 1975 to him stating *en toto*:

> "This is to assure you that the present Board of Directors of the Civic Art Realty Company realize you have two existing dwellings on your property. Because the smaller building now exists as a complete dwelling, the Directors would not object to the future occupancy of this building under the R-1 zoning restrictions."
> *Defendant's Exhibit 19*.

For purposes of laches, this letter speaks volumes. The Board recognized the existence of two dwellings and described the smaller one as "a complete dwelling." *Id*. Further, the Board acquiesced to the continued use of the smaller building as a dwelling under the proposed zoning change despite the fact the Board knew this constitutes a violation of the deed restrictions. This second acquiescence of the Board to the use of 620 ½ Cherry was in 1975, some 45 years after a tenant first appeared in the US Census at 620 ½ Cherry and 37 years before the Plaintiff filed this lawsuit.

The most recent occasion when the Civic Art Realty Company reviewed the use of 620 ½ Cherry was when William Lechner was Board President. In 2012, the Board received an "informal" opinion letter from Attorney Willam Schaaf that the deed restrictions were not enforceable regarding 620 ½ Cherry because no legal action had been taken in the nearly 100 years of the violations. *T.T. p. 158.* As a result, the Board decided not to take any enforcement action against the Defendant. When prodded, Mr. Lechner opined the decision not to take legal action was based 60-75 percent on the lack of merit and the remaining percentage due to a lack of funds. *T.T. p. 162.* The decision not to take legal action constitutes the third time the Civic Art Realty Company acquiesced to the use of 620 ½ Cherry as an apartment.

Over the decades there were a host of prominent lawyers who were associated with and/or resided in Garden Court.[5] Several lawyers were involved in attempting to dissuade Mrs. Kirshner from renting 620 ½ Cherry. Other lawyers were involved in reporting her to the zoning office. None of these lawyers or any other association member ever took legal action to enforce the deed restrictions against 620 ½ Cherry between 1913 and 2012.

Mathew Puz, the current zoning officer for the City of Erie, testified the City's records show a "permitted occupancy" at 620 Cherry allowing "a one-family dwelling in front and additional one-family dwelling (676 square feet) in rear – legal nonconforming use existing prior to 1968." *T.T. p. 113.* Mr. Puz believes the legal nonconforming use of the rear dwelling unit goes back to at least 1937 when the 1937 Polk Directory showed there was a tenant at 620 Cherry and a tenant at 620 ½ Cherry. *T.T. p. 116.* Whether 1937 is an accurate starting date is not dispositive. The main point is the legal, nonconforming use of 620 ½ Cherry predates the City of Erie's zoning ordinance enacted in 1968 and therefore is grandfathered in.

---

[5] Attorneys Ritchie T. Marsh, Charles Lovercheck, John Quinn, Harvey McClure, William Schaaf and Thomas Lent to name a few.

The Defendant also presented Scott Maas, the current Director of Assessment for the County of Erie. After the first full tax reassessment of properties in 33 years for Erie County, the assessment records since 2003 for 620 Cherry show two dwelling units, one in the front and one in the rear. *T.T. p. 131*. There are two separate assessment cards, one for each dwelling. The rear dwelling is listed as a 676 square foot bungalow type building built around 1913 containing a bedroom, two full bathrooms, one bedroom and a kitchen. There is central heat from a forced air and gas system. The building is listed as in good condition. *T.T. p. 132-135*. All of these assessment records are public documents available for inspection by any citizen.

When the Plaintiff bought 614 Cherry in 2005, Mrs. Bowler still owned 620 and 620 ½ Cherry.[6] The "complete dwelling" as described by the Board in 1975 still existed. By his own admission, the Plaintiff was in 620 ½ Cherry prior to buying the adjoining property. *T.T. pp. 31, 57*. He was also in this building during the three years Mrs. Bowler owned it before she sold the property to the Defendant in 2008. The Plaintiff knew the rear building was more suitable for residential living than for a garage. The Plaintiff was familiar with the restrictions within the Declaration prior to the purchase of his property. *T.T. pp. 25, 30, 31*.[7] At no time during these three years did the Plaintiff file any legal action to enforce the deed restrictions against Mrs. Bowler.

The Plaintiff was informed early on by the Defendant of the cosmetic updates he was making to both dwellings and his intent to rent the rear dwelling. *T.T. pp. 213-216*. The Defendant was very open with the Civic Art Realty Company Board about his renovations and at least three board members came to the Defendant's property to witness the work. *Id.* Yet it was

---

[6] John Bowler died on July 1, 2000.

[7] See also Plaintiff's Proposed Findings of Fact 15 ("Plaintiff was aware of the restrictions set forth in the Declaration of Trust and the restrictions played a role in his decision to purchase 614 Cherry Street.").

not until 2012, and after differences arose between Mr. Kohler and the Defendant, that the Plaintiff filed this lawsuit.

Hence, the Plaintiff failed to take action from the date of his purchase on December 10, 2005 until the filing of this lawsuit on June 20, 2012, a period of over 6 ½ years. During this time period, the Plaintiff acquiesced to the use of 620 ½ Cherry as had his predecessors in title and all of the other association members since at least 1913.

B.    The **Plaintiff is "Guilty Of A Want Of Due Diligence"**

To successfully assert the defense of laches, the Defendant must show the Plaintiff did not exercise due diligence in pursuing his claim against the Defendant. "In determining whether a party exercised due diligence, the focus is on what the party reasonably should have known by the use of the means of information within his reach, with the vigilance the law requires, not on what he actually knew." *Fulton, supra., p. 135.*

The Plaintiff maintains he did research about 620 Cherry before he bought the adjoining property. He claimed to have read the restrictions in the Declaration prior to his purchase. *T.T., pp. 25, 30, 31.* If so, the position he has taken in this lawsuit would have been obvious to him because there is no language in the Declaration prohibiting the rental of a building in Garden Court. He would have been aware of the restriction of one building per lot, which would make the very existence of 620½ Cherry an obvious violation of the Declaration prior to the Plaintiff's purchase of 614 Cherry.

As the Plaintiff's purported research of the property would have made him aware of the basis of his claim as early as 2005, the only way he can justify the belated filing of this lawsuit is if there was some change serving as the impetus for the lawsuit. The Plaintiff asserted just such a change in the Complaint.

In its entirety, Paragraph 11 of the Plaintiff's Complaint reads: "Sometime between 2008 and 2011, Defendant converted a garage on the premises into an apartment which is currently renting or is intending to rent." The Plaintiff, Thomas Wiler, signed the Verification to the Complaint in this case. *Plaintiff's Exhibit I*. This statement is patently false and the Plaintiff knew so when he signed the Verification.

The reason the Plaintiff knew it was false was because he was inside 620 ½ Cherry at least once before he bought 614 Cherry in 2005 and several times during Mrs. Bowler's ownership. During this time he knew there were four rooms, including a bathroom. The Plaintiff had no basis to believe the building was a garage nor did he identify any structural changes the Defendant made to convert it from a garage to an apartment.

By contrast, the Defendant presented a number of photographs of the interior of 620 ½ Cherry in 2007. *Defendant's Exhibits 9 – 11*. These pictures show that in 2007 the building was not a garage. Instead it was laid out for residential purposes. There was a kitchen stove in a kitchen room, with markings on the floor where a refrigerator once stood. There was a living room with a bookcase over a fireplace. *T.T. p.195*. There was a bathroom with a working toilet and sink. There was water and sewer service. There was forced air heating with a functioning furnace. The hot water heater was working. There was electricity and a separate meter for electrical service to this building.

The Defendant's pictures were taken before he bought the property and after the Plaintiff had been in 620 ½ Cherry several times with Mrs. Bowler. These pictures were also around 5 years before the Plaintiff signed the Verification to his Complaint.

According to Mrs. Bowler, the rear building was not a garage when they bought the property in 1961. Instead, it was always a house with a kitchen, bathroom, living room, furnace

room and gas and water service separate from the main house. *Plaintiffs' Exhibit 34, pp.7-12.* Mrs. Bowler's neighbor of 24 years, Mr. Urbaniak, had been in the rear building numerous times before 2008 and described a kitchen, bathroom and living room. *T.T. pp. 181-182.* Former Board President William Lechner observed the Defendant fixing up the rear structure and stated the Defendant did not convert the building from a garage. *T.T. pp.158, 159.* Mr. Lechner has lived in Garden Court since 2000 and never saw a garage door for a vehicle on this building. *Id.*

The Plaintiff adduced the testimony of Attorney Thomas Lent, a resident of Garden Court from 1990 to 2000. Attorney Lent authored a history of Garden Court. *Plaintiff's Exhibit 8.* According to him, the only property in Garden Court with a second building that was not a garage was 620 Cherry. *T.T. p. 99.* Attorney Lent observed the rear building used as an apartment because there was no garage door, it had a chimney and Mr. Bowler always parked his car behind it. *T.T. pp. 103, 104.*

The Defendant presented Richard Bertges, a licensed realtor/ broker whom he asked to evaluate the property before buying it. Mr. Bertges visited the premises at least twice before the Defendant's purchase. *T.T.p. 261.* The building known as 620 ½ Cherry had a kitchen with a sink and stove and a mark where a refrigerator stood. *T.T. p. 258.* There was a bathroom with a cast iron tub. *Id.* The bathroom and kitchen fixtures appeared to be of 1930s and 1940s vintage. *Id.* There was a living room and a bedroom. *T.T. p. 259.* There was forced air heating and a gas hot water tank. The electrical service was on. *Id.* It was not a garage, and there was no garage door. *T.T. p. 260.* Mr. Bertges' observations corroborated the Defendant's testimony.

Pictures of the physical structure of 620 ½ Cherry show that it was not a garage. There is not a door big enough to admit a vehicle. There were no structural changes to the building by the

This testimony is utterly false. Had the Plaintiff done any research before buying 614 Cherry, prior to verifying his Complaint, or prior to trial, he would have known that the tax status of 620 and 620 ½ Cherry has been unchanged since 2003. Also, there has been no change in zoning status of the property since 1968.

Under these circumstances, the Plaintiff is "guilty of a want of due diligence" in bringing this claim against the Defendant. *Fulton, supra.*

## C. For Laches Purposes, the Defendant has Suffered Actual and Irreparable Prejudice

The second prong of a laches claim involves proof of prejudice. In this case, the Defendant would suffer actual and irreparable prejudice/harm due to the Plaintiff's lack of due diligence and nearly a century's worth of Garden Court members sleeping on their right to object to 620 ½ Cherry.

Upon observing the parties testify, this Court finds the Defendant was more credible and straightforward than the Plaintiff. Unlike the Plaintiff, the Defendant was very thorough in researching the use of 620 ½ Cherry before buying in the Garden Court. *T.T. p. 197.*

The Defendant knew three owners within the Garden Court and discussed this property with them prior to his purchase. *T.T. p. 204.* In fact it was one of these owners, Gerry Urbaniak, who suggested the Defendant consider buying 620 Cherry. *T.T. p. 198.* The Defendant discussed with them the rules of Garden Court and learned of the Declaration. He received an emailed copy of the Declaration and read the restrictions, which prompted his investigation to ensure that he could use 620 ½ Cherry as a rental. *Id.*

The Defendant reviewed the letter from Attorney John Bowler claiming the right for himself, spouse and subsequent owners to use the rear building for residential use. *T.T. p. 211. Defendant's Exhibit 17.*

The Defendant's professional work in municipal matters, including zoning, helped. *T.T. p. 205.* He researched the current R-1 zoning and quickly learned 620 ½ Cherry was a recognized nonconforming use predating the zoning ordinance. *T.T. p. 205.*

The Defendant researched the county tax assessment records on the county's website and learned the rear building was listed as a bungalow dating back to 1913. *T.T. p. 203.* The City of Erie directories, phone books and census reports found at the public library revealed to the Defendant there were tenants at 620 ½ Cherry since the 1930s. *T.T. p. 203.*

The title search of the property for closing purposes did not uncover any lawsuits ever filed against or liens placed against 620 or 620 ½ Cherry in the preceding 100 years. *T.T. p. 241.*

The Defendant toured 620 ½ multiple times before buying it. *T.T. p. 199.* He took pictures of it in 2007. *Defendant's Exhibits 7-11.* These pictures clearly show from the vintage of the electrical and plumbing fixtures a long history of residential use. The floor plan of the building was intended for residential use more than any other type of use. There were no structural changes necessary to create living space.

There was viable plumbing, heating and electrical service to 620 ½ Cherry. The Defendant toyed with the idea of living in the rear building while fixing up the main building. *T.T. p. 200.*

The Defendant had someone with expertise, Richard Bertges, look at the rear building prior to the purchase. Mr. Bertges' observations corroborated the Defendant's in terms of the historical and present use of the rear building.

The Defendant bought the house with the understanding the rear building was a separate residence with a separate address dating back to the 1930s. *T.T. p. 197.* Although the Defendant

knew of the restrictions on the property, he believed the history of it meant the rear building was a recognized non-conforming use and could be rented. *T.T. pp. 203-205.*

The Defendant's calculus of the costs of ownership required that 620 ½ Cherry was rentable. In his view it was in livable condition, just needed some cosmetic work. *T.T. p. 200.* The Defendant would not have purchased the property if he could not have rented out the rear dwelling. *T.T. pp. 219-220.* The ability to rent the rear building was the deciding factor in the Defendant's decision to purchase the home. *T.T. pp. 219-220.* This building is not otherwise useful to the Defendant since he and his wife do not need 4 bedrooms (between the two dwellings). *T.T. p. 219.*

The Defendant did not hide his intent to give the rear building a face lift so that he could rent it out. The first time the Defendant had the chance to talk to the Plaintiff in early 2008 he told him of his plans to update and rent the rear building. *T.T. p. 213.* The Defendant also told three members of the Civic Art Realty Company of his plans and each at times visited his property to observe the work. *T.T. p. 213, 214.*

The Defendant began his work on the rear building right after the closing in early 2008. The Plaintiff observed the Defendant working on the rear building for years before filing this lawsuit.

The Defendant created his own sweat equity in 620 ½ Cherry by virtue of the time, labor and expenses invested in making cosmetic upgrades to it. The Defendant and his wife did most of the work, including replacing the electrical wiring. *T.T. p. 201, 202.* They removed about 100 years of wallpaper, painted walls, removed carpet, removed paint from wood trim, finished the floors and installed several storm windows. *Id.* The Defendant updated the appliances. The

Defendant has rented the apartment since 2012 on a seasonal basis to various coaches of the Erie Seawolves, a Double A minor league baseball team in Erie. *T.T. p. 222*.

Hence, the Defendant has suffered actual prejudice by the Plaintiff's lack of due diligence.

For the Defendant to be enjoined from renting 620 ½ Cherry deprives him of the benefit of purchasing this property and adversely affects his ability to pay for his property. He would not have bought this property if he knew he could not rent the rear building. These forms of prejudice are irreparable.

By virtue of the actual and irreparable prejudice/harm to the Defendant, the second prong of laches is satisfied.

## III. A PERMANENT INJUCTION IS NOT WARRANTED

To be entitled to the extraordinary remedy of permanent injunctive relief the Plaintiff seeks, there must be a clear right to relief; an urgent necessity to avoid an injury that cannot be compensated in damages; and a finding that greater injury will result from refusing, rather than granting, the relief requested. *Woodward Twp. v. Zerbe*, 6 A.3d 651, 658 (Pa. Commw. Ct. 2010) quoting *Big Bass Lake Community Association v. Warren*, 950 A.2d 1137, 1144 (Pa. Cmwlth. 2008). Even if the essential prerequisites are satisfied, a permanent injunction should be issued with caution and "only where the rights and equity of the plaintiff are clear and free from doubt, and where the harm to be remedied is great and irreparable." *Id*.

Based on the foregoing, the Plaintiff has failed to establish the first requirement. As to the second and third prongs, the Defendant would suffer far greater harm than the Plaintiff should an injunction be granted.

The Plaintiff fails to identify any harm that he is suffering that his predecessors in title dating back at least to 1930 did not suffer. Other than cosmetic updates, 620 ½ Cherry has remained structurally the same size and dimensions since its original construction.

When asked what irreparable harm he suffers, the Plaintiff replied he "purchased the home in the Court versus anywhere else in the City to get away from having multiple dwellings next to me." *T.T. p. 57.* This testimony cannot be true. The Plaintiff knew of the existence of 620 ½ Cherry before he bought his property. In fact, he was inside this building prior to his purchase so he observed the living quarters there. *Defendant's Exhibits 9-12.* The Plaintiff made a conscious choice to buy his property knowing there were two dwellings next door.

To create a basis to argue he suffered harm (and possibly avoid laches), the Plaintiff concocted the garage conversion story to try to make it appear that it was a garage in 2005 when he bought next door but somehow the Defendant surreptitiously converted it to an apartment between 2008 and 2011. The Plaintiff's testimony on this subject is fictional.

The Plaintiff also represented he was harmed because he lost privacy and the use of his yard. To lose something requires that the something previously existed. The Plaintiff fails to establish how he lost privacy or use of his yard when 620 ½ Cherry has been there long before his ownership. This is not a case of a new building being erected next door after the Plaintiff's purchase, taking away the Plaintiff's existing privacy and/or use of his yard.

It is uncontroverted the Plaintiff rents 614 Cherry. According to the Defendant, the Plaintiff did not live at 614 Cherry and was there occasionally on week-ends. *T.T. p. 213.* At trial the Plaintiff acknowledged he has lived in Westfield, New York for the last 2 or 3 years. *T.T. p. 59.*

Although originally the Plaintiff was coy on this point, ultimately he admitted on cross-examination that he has 614 Cherry listed for sale and intends to rent it out until he sells it. *T.T. p. 60.* Plaintiff cannot claim a lack of privacy or lost use of yard when he does not live there. Further, the Plaintiff did not present any evidence from any tenant, including Michael Kohler, that there was a loss of privacy and/or a loss of the use of the back yard caused by his neighbors. As a result, the Plaintiff never adduced any form of evidence to support his claimed lack of privacy, lost use of his yard or any alleged traffic problems.

This Court does not find any credible evidence of harm established by the Plaintiff. Instead, this Court finds the real motivation for this lawsuit was vindictive based on events involving Mr. Kohler, with whom he has some form of a relationship beyond landlord/tenant.[8]

In April, 2011, Mr. Kohler lived at 614 Cherry. On April 25, 2011, as the Defendant was directing storm water down his driveway with a shovel, Mr. Kohler came out and erupted into a vulgar rant toward the Defendant and the Defendant's wife. At first the couple thought Mr. Kohler was joking but then realized he was serious. Mr. Kohler's behavior was so worrisome the Defendant called Crisis Services seeking help for him. The Defendant also sent an email to the Plaintiff asking if Mr. Kohler was on some type of medication. The Plaintiff never responded. *T.T. pp. 214-215.*

The situation quickly escalated that evening when Mr. Kohler posted 18 No Trespassing signs along their common border. The Defendant requested the signs be removed. Kohler refused and failed to offer any apology for his behavior. *T.T. p.215.*

Next, Mr. Kohler and/or the Plaintiff installed a spotlight that shone directly on the Defendant's house. This intentional nuisance continued until eventually the Plaintiff received a notice to cease from the City of Erie zoning office. It was an unsettling situation that caused the

---

[8] His lawyer described Mr. Kohler as the Plaintiff's "partner" without any further elaboration. *T.T. pp. 14-15.*

Defendant to file harassment charges against Mr. Kohler which were resolved by a Magisterial District Justice. The Defendant installed a security camera out of fear for his wife's safety from Mr. Kohler. *T.T. pp. 215-216.*

It was in the wake of these events that this lawsuit was subsequently filed by the Plaintiff. It is not lost on this Court that Mr. Kohler, who had no ownership interest in 614 Cherry, was originally a named plaintiff in this lawsuit and remained so through the time of trial despite his obvious lack of standing. The Plaintiff's motivation in filing this lawsuit was not about any purported harm, it was rather out of spite for the Defendant.

Consequently, the Plaintiff fell woefully short of adducing sufficient evidence at trial that would warrant a finding that greater injury will result from refusing, rather than granting, the relief requested.

## VII. CONCLUSIONS

The Plaintiff has no equitable basis to prevent the Defendant from renting a building under the plain meaning of the restrictions within the Declaration. If the Defendant is in violation of the restrictions, so is the Plaintiff.

The objective evidence is overwhelming that 620 ½ Cherry has been used as a residential apartment likely since the early 1920s. Despite this open use of 620 ½ Cherry, there was never any legal action instituted to enforce the violation of the deed restrictions by the Civic Art Realty Company or any other association member, including the Plaintiff's predecessors in title.

The Plaintiff was not duly diligent in bringing this claim against the Defendant. The Plaintiff's contention the Defendant converted the rear structure from a garage to an apartment sometime between 2008 and 2011 is intentionally misleading and a transparent attempt to manufacture a reason for the belatedly filed lawsuit. Overall, the Plaintiff was coy and evasive;

much of his testimony was not credible. The doctrine of laches bars any enforcement claim in equity by the Plaintiff.

To grant an injunction would cause actual and irreparable prejudice to the Defendant. Conversely, the Plaintiff has failed to establish what harm he would suffer as a result of the Defendant's use of the building. Thus, greater injury would result from granting, rather than refusing, the injunction.

BY THE COURT:

DATE: 5/24/16

WILLIAM R CUNNINGHAM, JUDGE

cc: Gery Nietupski, Esquire, 818 State Street Suite A, Erie PA 16501
Richard Filippi, Esquire, 504 State Street Suite 200, Erie PA 16501